IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JEFF D. et al.,  ) | |
| ) | Case No. CV-80-4091-E-BLW |
| Plaintiffs,  ) | |
| ) | **FINDINGS OF FACT AND** |
| v.  ) | **CONCLUSIONS OF LAW** |
| ) | |
| DIRK KEMPTHORNE, et al.,  ) | |
| ) | |
| Defendants.  ) | |
| _____ ) | |

**INTRODUCTION**

The Court held a compliance hearing from September 5, 2006 to September 19, 2006. Thereafter, the parties filed proposed findings of fact and conclusions of law. The Court now issues its Findings of Fact and Conclusions of Law.

**BACKGROUND**

The Court will give a very brief outline of the history of this case, which has been pending in some form or another for over a quarter of a century.

In 1980, a complaint was filed on behalf of indigent children suffering from a severe emotional disturbance ("Plaintiffs"). The case was eventually certified as a class action. The complaint alleged violations under the U.S. Constitution, the Idaho Constitution, and federal and state statutes. The complaint sought only

declaratory and injunctive relief.

In 1981, the parties settled many, but not all, of the claims.  In a 1983 settlement agreement between the parties, the defendants agreed to virtually all of the injunctive relief sought by Plaintiffs.  Among other things, the agreement specifically required the defendants to prepare a needs assessment of children's mental health programs and to provide the class members with facilities and staff for community-based mental health programs and services.  The agreement also provided for continuing jurisdiction by the district court for five years or until the district court was satisfied by stipulation or otherwise that the claims for relief were adequately addressed.  This Court entered the agreement as a consent decree in April 1983.

During the late 1980s, Plaintiffs, concerned about the state's compliance with the consent decree, filed a motion to enforce the consent decree.  The parties again negotiated a settlement and eventually stipulated to a supplemental agreement in December 1990.  The agreement reiterated the defendants' prior obligations, but also expanded them.  This Court again entered the agreement as a consent decree.

In 1993, Plaintiffs filed a motion requesting that the defendants comply with the decrees.  The defendants did not contest that they were failing to comply with

**Findings of Fact and Conclusions of Law - 2**

certain aspects of the agreements and, with the plaintiffs, submitted a joint proposal on how to assure the defendants' compliance. This Court adopted the proposal and entered an additional order requiring the defendants to immediately allocate a minimum level of resources, which was recommended by the defendants, to each of seven regions within the state for the provision of the agreed-upon community services.

Plaintiffs continued to believe that the defendants were not complying with the decrees, and the defendants agreed in 1995 to conduct independent evaluations of the state's mental health system for children. The defendants also agreed to conduct evaluations of the defendants' compliance with the decrees. In 1997, the defendants hired outside experts to conduct a compliance review. Based on the compliance review, Plaintiffs moved for a finding of contempt in March 1998. Once again, the parties negotiated a settlement that provided for an additional independent needs assessment and the creation of a compliance action plan. The defendants also agreed to submit requests for funding to the Joint Finance and Appropriation Committee of the Idaho State Legislature, and agreed in principle with the findings and recommendations made in the 1998 compliance review. In December 1998, this Court approved the compliance agreement and entered yet another consent decree.

**Findings of Fact and Conclusions of Law - 3**

As required by the 1998 agreement, the defendants completed a Needs Assessment and developed a compliance plan for the Needs Assessment's recommendations.  Plaintiffs objected to the defendants' proposed plan, and again moved for a finding of contempt in 2000.  The defendants objected and filed a motion to dismiss or to vacate the consent decrees.  This Court denied Plaintiffs' motion for contempt, but also denied the defendants' motion to dismiss or to vacate the consent decrees.[1]

At that point, this Court determined that it would take a more active role in the case.  As required by the 1998 consent decree, the Court specifically ordered the parties to meet and develop a compliance plan based on the Needs Assessment in order to provide a comprehensive blueprint of how the defendants would meet the requirements of the decrees.  The parties complied and submitted a proposed compliance plan.  The plan included some disagreements by the parties, which the Court resolved in a June 4, 2001 Memorandum Decision.  This resulted in the adoption of a final compliance plan, known as the Implementation Plan.  The Implementation Plan includes 50 Recommendations, and each Recommendation contains  underlying Action Items.

_____

[1] The defendants appealed the decision to the Ninth Circuit, but the Ninth Circuit affirmed.

**Findings of Fact and Conclusions of Law - 4**

Thereafter, the parties filed several status reports updating the Court on their progress toward fulfilling the Implementation Plan.  The parties also filed a fairly comprehensive joint report to the Court ("Joint Report") on May 20, 2002.

At a January 2003 status conference, the Court asked the parties to meet and create a matrix (the "Matrix") identifying which Action Items the parties could agree had been complied with, and those to which the parties disagreed as to compliance.  The parties filed the Matrix on June 26, 2003.

After wrestling with the idea of appointing a special master to help resolve the case, the Court declined to do so and set the case for a final compliance hearing.  In an attempt to narrow the issues to be addressed at the compliance hearing, the Court ordered the parties to file a joint stipulation of undisputed facts.  Based on that joint report, the Court made a determination as a matter of law on whether the defendants had complied with certain of the Action Items.  From September 5, 2006 to September 19, 2006, the Court held a compliance hearing in order to make a final compliance determination.  Thereafter, each party submitted proposed findings of fact and conclusions of law.

## ANALYSIS

**A.      General legal standard for finding civil contempt.**

In an earlier decision in this case, the Ninth Circuit set forth the general

standard for enforcing the consent decrees.  The Ninth Circuit stated that "[a]n

agreement to settle a legal dispute is a contract and its enforceability is governed

by familiar principles of contract law." *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th

Cir. 1990).  "Since consent decrees and orders have many of the attributes of

ordinary contracts, they should be construed basically as contracts." *Id*.  "The

construction and enforcement of settlement agreements are governed by principles

of local law which apply to interpretation of contracts generally."  Thus, the Ninth

Circuit stated that the Court must apply Idaho contract law in this case because the

consent decrees were entered into in Idaho and the parties are all residents of

Idaho.  *Id*. at 759-60.

The Ninth Circuit went on to state that "in interpreting any provision in a

contract, the entire agreement must be viewed as a whole," and that "[u]nless the

writing was intended as a complete and exclusive statement of the terms of the

agreement, the court may look to the intent of the parties, revealed by their conduct

and language, and by the surrounding circumstances to determine if a particular

subject of negotiation is embodied in the writing." *Id*. at 760.  Moreover, "[u]nder

Idaho law, the court may interpret agreements in accordance with the parties'

intention even when the forms they employed suggest otherwise." *Id*.

In determining whether a party has complied with a consent decree, the

**Findings of Fact and Conclusions of Law - 6**

Court must consider what enforcement mechanisms are available.  Obviously, the only real sanction available to the Court is to find that a party is in contempt for failing to comply with the consent decree.  In this regard, the Court is mindful that "[c]ivil contempt is appropriate only when a party fails to comply with a court order that is both specific and definite."  *Balla v. Idaho State Board of Corrections*, 869 F.2d 461, 465 (9th Cir. 1989).  "[T]o support a contempt motion, the order alleged to have been disobeyed must be sufficiently specific."  *Id.*  For example, in *Balla*, the Ninth Circuit found that the standards in the court order cited by the prisoners were too vague to support a contempt motion.  *Id.*  Those standards included "requirements as a 'systematic' program for screening and evaluation, participation of 'sufficient' numbers of mental health professionals, and implementation of a 'basic' program for identifying, treating, and supervising suicidal prisoners."  *Id.*  The Ninth Circuit stated that the terms were "too general to be enforced through a contempt motion."  *Id.*

"The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by clear and convincing evidence, not merely a preponderance of the evidence."  *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotations and citations omitted).  A party should not be held in contempt if its action "appears to

**Findings of Fact and Conclusions of Law - 7**

be based on a good faith and reasonable interpretation of the court's order." *Id.* (internal quotations and citations). "Substantial compliance with the court order is a defense to civil contempt, and is not vitiated by a few technical violations where every reasonable effort has been made to comply." *Id.* (internal quotations and citations omitted). Thus, for a plaintiff to succeed on a motion for civil contempt, it must "show by clear and convincing evidence that [the defendant] violated the consent judgment beyond substantial compliance, and that the violation was not based on good faith and reasonable interpretation of the judgment." *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322 (9th Cir. 1997).

**B.    Analysis for determining contempt in this case.**

As alluded to above, the Court in 2000, realizing the difficulty the parties were having resolving this case, and as required by the 1998 consent decree, asked the parties to develop a comprehensive blueprint of how the defendants could meet the requirements of the consent decrees. The parties complied and created the Implementation Plan, which was based on and addressed each recommendation in the 1999 Needs Assessment. The final Implementation Plan consists of 50 Recommendations, each of which contain underlying Action Items for accomplishing the Recommendations.

As the Court indicated to the parties prior to the compliance hearing, the

**Findings of Fact and Conclusions of Law - 8**

Court has concluded that the best way to determine whether the defendants are in compliance with the consent decrees is to analyze the Implementation Plan on an Action Item by Action Item basis.  Such an analysis is in line with the direction given by the Ninth Circuit in *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1990) and *Balla v. Idaho State Board of Corrections*, 869 F.2d 461, 465 (9th Cir. 1989) because the Action Items are the best indicator of the parties' intent and the best indicator of whether a particular subject of negotiation is embodied in the consent decrees.  *Jeff D.,* 899 F.2d at 760.  Admittedly, many of the Action Items lack specificity.  However, of the filings and documents available to the Court, they are clearly the most specific and detailed statement of the defendants' duties under the consent decrees.  *See Balla*, 869 F.2d at 465 (9th Cir. 1989).

In summary, the Court will accept the Implementation Plan and its Action Items as a fair expression of the parties' understanding of the defendants' obligations of the consent decree.  The Court will therefore evaluate the evidence presented to determine whether the defendants violated the Action Items, beyond substantial compliance, not based on a good faith and reasonable interpretation of the Action Items, by clear and convincing evidence.  *See Dual-Deck*, 10 F.3d at 695; *see also Wolfard*, 118 F.3d at 1322.

## C.    Idaho Council on Children's Mental Health ("ICCMH")

A number of the Action Items require action on the part of ICCMH.  The ICCMH is made up of a nine-member council, which includes representatives from each of the following agencies: (1) the Office of the Governor of Idaho; (2) the Idaho State Legislature; (3) the Idaho State Judiciary; (4) Idaho Department of Health and Welfare ("DHW"); (5) Idaho Department of Juvenile Corrections ("DJC"); (6) Idaho State Department of Education ("SDE"); (7) the State Planning Council on Mental Health; (8) a parent representative or advocate; and (9) a representative of providers of children's mental health services.  Thus, an individual defendant's duty under a given Action Item requires a defendant's action as a member of ICCMH, not as an independent agency.

Accordingly, when determining whether a defendant is in compliance with an Action Item that requires action on the part of ICCMH, the Court will consider whether, and to what extent, Plaintiffs have shown by clear and convincing evidence that an individual defendant has a specific duty to act.  If a defendant failed to do its part as a member of the ICCMH, the Court will hold that defendant in contempt.  However, a general assertion that the ICCMH failed to fulfill an Action Item is not sufficient to find an individual defendant in contempt.

## FINDINGS OF FACT

For the most part, the Court finds that the defendants' proposed Findings of

Fact accurately reflect the evidence submitted at the compliance hearing.

Accordingly, the Court will use the defendants' proposed findings as the starting

point for outlining the Court's Findings of Fact.  However, the Court does not

agree with all of defendants' proposed factual findings or the defendants'

contention that they are in compliance with all Action Items, and the Court will

make those distinctions when necessary.

Accordingly, the Court will address the Action Items on an Action Item by

Action Item basis below.[2]  The Court will first re-state the language of each Action

Item in bold.  The Court will then list the facts related to the Action Item and state

whether the defendants are in compliance with the Action Item.

## A.    Action Items

**1B:    By July 1, 2001, and annually thereafter, DHW, County Probation, schools districts and DJC will identify staff training opportunities for family members of children with SED to present information regarding SED issues, resources available, family support services and family involvement.  The FACs academy is one such possible opportunity for families to present to staff on issues surrounding children with SED.**

DHW enacted the Family and Children's Services Policy Memorandum,

which was effective July 1, 2001.  (Exhibit. 2000; Tr., p. 1325).  The

---

[2] In its April 28, 2006 Memorandum Decision and Order, the Court already determined compliance or non-compliance on a number of Action Items based on the parties' stipulated undisputed facts.  The Court will not address those Action Items in the Findings of Fact portion of this decision.

**Findings of Fact and Conclusions of Law - 11**

Memorandum requires DHW to identify staff training opportunities.  (Tr., p. 1326).  DHW has had a contract with the Federation of Families for them to provide training and identify parents and provide parents with support services throughout the state since 1999.  (Tr., p. 1332).  The Court finds that DHW substantially complied with Action Item 1B.

> **1C:   By May 1, 2001, SDE, DHW and DJC will identify all their advisory boards and councils serving children with SED and their families.  They will identify barriers and structural changes within the agencies that are needed in order to increase families' participation on the appropriate boards or councils.  Child and family serving boards that can currently accommodate these families and children will be asked to add such members to their board.  Those that cannot accommodate family members will be asked to identify mechanisms for assuring that families of children with SED have input to the board/council on issues regarding children's mental health services. By July 1, 2001, each agency will report to the Idaho Council on Children's Mental Health, the number of boards/councils that currently have parents of children with SED or have added parent/child positions to their membership and other mechanisms for family members to provide input.  DJC will be creating citizen advisory boards for each of its three regional facilities to serve the needs of committed juveniles with SED, and parent representatives will be included on those boards**.

DHW identified advisory boards in 2001, which had parents on them.  (Tr., p. 1436).  DHW also identified barriers and changes within the agencies in order to increase families' participation on Boards and Councils.  (Tr., p. 1347-48).  DHW identified the Advisory Boards and Councils serving children with SED and

**Findings of Fact and Conclusions of Law - 12**

presented them to the ICCMH.  (Exhibit. 2009; Tr., p. 1547).  DHW identified

parents of children with SED on the mental health planning council. (Exhibit.

2010; Tr., p. 1348).  The Court finds that DHW substantially complied with Action

Item 1C.

> **1E:    By September 1, 2001, DHW, DJC, and SDE will work with the
> State Planning Council on Mental Health's subcommittee on Jeff
> D. and parent representatives to develop ways of facilitating
> parental/family membership on advisory boards.  Such methods
> of facilitation may include stipends, honoraria, scheduling
> meetings on weekends or evenings, or the provision of appropriate
> daycare.  DJC is going to contract with the Federation of Families
> to develop a family satisfaction survey**.

DHW discussed developing ways of facilitating parental/family involvement

on advisory boards with the state planning council of mental health at the January

15-16, 2002 meeting and presented the policy to the subcommittee.  (Exhibit 2015)

The policy, entitled "Parent Participation Reimbursement," provided honorarium

for parents' attendance.  (Exhibit 2012).  The policy was effective October 10,

2001.  (Tr., p. 1315).  Although DHW may not have met its deadline, the Court

finds that DHW substantially complied with Action Item 1E.

> **1F:    By September 1, 2001, DHW, DJC, SDE, and a parent advocacy
> group that serves children with mental emotional behavior
> disorders will each develop methods of providing training to the
> parent representatives for their service on the various advisory
> boards and councils**.

DHW developed methods providing training by adopting policy 01-06,

effective 2001, entitled, "Training Provided to Parent Representative on Boards and Councils."  (Exhibit 2022; Tr., p. 1360-62).  DHW also contracted with the Idaho Federation of Families to assist with training parental representatives for service on boards and councils.  (Exhibit 2024; Exhibit 2433).  Additional training was provided through the Orientation Manual.  (Tr., p. 1366).  Training referred to as "Planning Council 101" was been presented to parents."  (Tr., p. 1368).  The Court finds that DHW substantially complied with Action Item 1F.

**IG:**   **This recommendation also coincides with the action items under recommendation 3, which discusses the development by the state level council of a communications plan**.

This is simply a statement referencing another recommendation. It does not require any specific action on DHW's part to meet compliance with this particular Action Item.

**1H:**   **DHW will address the issue by emphasizing the importance of showing respect for the parents and making them full partners on their respective councils/boards**.

The Department of Health and Welfare recognized the need and importance of parents on boards and councils by enacting the reimbursement policy, the training policy, and the family involvement standards. (Exhibits 2012, 2022, 2023 and 2024).  DHW substantially complied with Action Item 1H.

**1I:**   **The issue of parent stipends for attendance at the meetings will also be clarified and addressed**.

Findings of Fact and Conclusions of Law - 14

DHW adopted the "Parent Participation Reimbursement" policy on October 10, 2001. (Exhibit 2012). The policy provides guidance on the issue of parent stipends for attendance at meetings. The Court finds that DHW substantially complied with Action Item 1I.

**1J:    The Department will develop a grievance procedure for receiving parental complaints that are not being addressed at the regional level**.

DHW adopted the "Information Provided to Parents of Appeal Process" policy. (Exhibit 2027). The policy requires all clinicians to inform all parents of their right to appeal decisions concerning the care of their children, and it provides a specific process to enable parents to appeal if their grievances are not addressed at the regional level. At the time they apply for services, DHW provides parents with appeals process information. (Exhibit 2148; Tr., p. 1373). The Court finds that DHW substantially complied with Action Item 1J.

**1K:    The Federation of Families will be given the names, addresses and phone numbers of the parents on the regional and local councils so that systems and advocacy training can be provided**.

Although DHW introduced of a few e-mail addresses and parental names given to the Federation of Families (Exhibit 2031), DHW has failed to substantially provide the Federation of Families with names, addresses and phone numbers of parents on the regional and local councils so that systems and advocacy

training can be provided.  Thus, the Court finds that DHW has not substantially

complied with Action Item 1K.

**1L:    DHW will distribute information notebooks to all council members**.

DHW created and distributed an information notebook in 2002.  (Exhibit

2025).  The Court finds that DHW substantially complied with Action Item 1L.

**1M:    DHW will review the communications plan to see where parents can be tapped to ensure that information gets out to schools, doctors' offices, and into the communities so it reaches families, and to inform families of the resources available and how they might access the system of care**.

In 2002, ICCMH approved a communication strategy creating a method for

disseminating information on children's mental health services.  (Exhibits 2034

and 2035).  The communication plan was revised in 2004.  (Exhibit 2036). Exhibit

2036 sets forth the revised communication plan that was developed in 2004.  The

Court finds that DHW substantially complied with Action Item 1M.

**2B:    The Council shall have the duty to evaluate, prioritize and make recommendations regarding the funding and delivery of children's mental health services statewide**.

This Action Item specifies that ICCMH has obligations with respect to

funding of children's mental health services statewide.  All decisions regarding the

$129,000.00 of trustee and benefit funds given to ICCMH yearly for operation and

establishment of councils and how to spend the money, are made by the ICCMH.

**Findings of Fact and Conclusions of Law - 16**

(Tr., p. 1684).  ICCMH has the ability to make budget recommendations for increasing the ten core services (Tr., p. 951, Ls. 20-25), and ICCMH has recommended support for DHW funding increases and has discussed making a budget recommendation to the Governor.  (Tr., p. 936).  ICCMH made some efforts at  compliance with Action Item 2B.  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

> **2D:    One of the first tasks of the ICCMH will be to develop delegation strategies in order to successfully meet the deadlines and goals set forth in the action plan**.

Mr. Halligan is the DHW representative, along with Ms. Richter, who has assisted ICCMH in accomplishing the ICCMH's responsibilities under the plan. (Tr., p. 930).  While Mr. Halligan does not set ICCMH meeting, agendas, or perform monitoring of ICCMH activities, Mr. Halligan and others have assisted ICCMH in gathering data and drafting documents.  (Tr., p. 930-31).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had requirements under the Action Item, DHW substantially complied

with those requirements.

> **2E:    By July 1, 2001, the Council will establish a definition of
> "collaboration" to be agreed upon by the membership and which
> will serve as a foundation for accountability measurements.  This
> definition will be followed by the local councils upon their
> establishment**.

On July 1, 2001, ICCMH adopted the definition of "collaboration."  (Exhibit

2045).  Plaintiffs failed to present clear and convincing evidence that the

defendants failed to comply with any specific and definite requirements of the

defendants related to this Action Item, and therefore Plaintiffs failed to meet their

burden of proof.  Moreover, to the extent DHW had requirements under the Action

Item, DHW has substantially complied with those requirements.

> **3A:    The ICCMH will establish a protocol for the dissemination of
> information and for receiving input and questions from
> stakeholders.  The protocol will, at minimum, include the creation
> of an electronic bulletin board, use of public meetings, posters and
> other media, and publication of phone numbers for information.
> The protocol will be in place by July 1, 2001.  In addition the
> formal protocol, members have the responsibility to communicate
> with and gather input from the entities they represent**.

DHW assisted ICCMH by developing Exhibit 2045, a proposal to ICCMH

that allowed ICCMH to consider Action Items under the Court implementation

plan, allowed ICCMH to be advised concerning its own actions to be completed

under the plan, the dates submitted, and the end result.  Exhibit 2045 shows that the

definition "collaboration" was approved by ICCMH on June 19, having been

submitted on May 15, 2001.  (Tr., p. 1379-80).  On June 19, 2001, the Department

submitted to ICCMH the written protocol incorporating the ICCMH web page on

the DHW website, and containing the overview of ICCMH, information on local

councils, minutes, meeting dates, and locations of meeting, together with links to

other state agencies.  ICCMH approved the protocol on July 24, 2001.  (Tr., p.

1380-82).  ICCMH, with the assistance of DHW, established a protocol as required

under Action 3A.  Plaintiffs failed to present clear and convincing evidence that the

defendants failed to comply with any specific and definite requirements of the

defendants related to this Action Item, and therefore Plaintiffs failed to meet their

burden of proof.  Moreover, to the extent DHW had requirements under the Action

Item, DHW substantially complied with those requirements.

> **3B:    By March 1, 2002, the ICCMH will develop a comprehensive
> communications plan using the established protocol.  The
> communications plan will utilize various multi-media methods for
> the dissemination of information on children's mental health
> services and for outreach activities throughout the state**.

Ms. Story testified that Exhibits 2039, 2053, 2054, 2252, 2253, 2254, 2249,

2250, and 2251 identify all the radio, television, print and handout multi-media

methods authorized by ICCMH.  (Tr., p. 1484).  However, the defendants failed to

explain whether and how these methods are used for dissemination of information

on children's mental health services and for outreach activities throughout the

**Findings of Fact and Conclusions of Law - 19**

state. Thus, the Court finds that DHW has not substantially complied with Action Item 3B.

> **3C:** **The access of the local councils to technical assistance needs to be addressed and will be further clarified by a written protocol by August 1, 2002**.

The ICCMH designated Chuck Halligan as the contact individual to facilitate local council technical assistance.  This appointment is reflected in the ICCMH minutes of August 20, 2002.  (Exhibit 2044, p. 4).  Technical assistance means answering questions, providing training, or other information that may be requested.  (Tr., p. 1383).  Councils can access Mr. Halligan for technical assistance, questions by e-mailing him, calling him or sending him a letter.  (Tr., p. 1383).  Exhibit 2051 is a copy of the Department's web page under ICCMH.  If one clicks that button, contact information for Mr. Halligan is set forth.  (Tr., p. 1384).  The Court finds that DHW substantially complied with Action Item 3C.

> **3D:** **DHW will review their Communications Plan and make further recommendations on outreach, including the possible use of public service announcements, regional brochure dissemination to organizations that have contact with families and children, further publicity on the available website, clarification of the role of the Regional and Local councils to provide information to their communities, and the use of parents and family advocates as a resource for information dissemination**.

DHW has not made recommendations on outreach.  The Court finds that DHW has not substantially complied with Action Item 4C.

**Findings of Fact and Conclusions of Law - 20**

**3E:     DHW will work with DJC to develop mechanisms for educating and informing the judges, and county probation officers that work with juveniles about the local councils and DHW's assessment resources**.

DHW placed the Director of DHW on the Juvenile Justice Magistrate Advisory Committee, and placed Ross Edmonds on the Association of County Juvenile Justice Probation Administrators.  Mr. Halligan has attended the Magistrate Institute.  (Tr., p. 1384).  Goals and objectives also exist for the Juvenile Justice/Children's Mental Health Collaboration Work Group.  (Exhibit 2058).  The Court finds that DHW substantially complied with Action Item 3E.

**3F:     DHW will use the lessons learned from the Region II pilot program to aid in the development of recommendations to the ICCMH on a statewide after-care protocol for the local councils when they are staffing a child coming out of DJC or other long-term placements**.

DHW developed a protocol for DHW and members of Juvenile Justice agencies to work together to identify and address mental health needs of children with SED.  ICCMH adopted a business practice model for local councils to work with facilities and children regarding long term and DJC commitments.  (Exhibits 1211 and 2060; Tr., p. 1388).  The Court finds that DHW substantially complied with Action Item 3F.

**4A:     The Executive Order establishing the Idaho Council on Children's Mental Health will authorize the Council to establish local level councils according to resources, population, need and**

Findings of Fact and Conclusions of Law - 21

**geographic considerations.  The Idaho Council will define the specific key duties, powers, goals and outcomes to be achieved by the local councils, with local councils working in collaboration with the regional Health and Welfare offices to determine specific targets and priorities according to identified needs in the particular region**.

Executive Orders 2001-05 established and authorized ICCMH to establish local level councils according to resources, populations, need and geographic considerations (Exhibits 1153 and 2040).  ICCMH established a local charter template, setting forth the responsibilities of local council, along with duties, powers, goals and outcomes to be achieved by local councils.  (Exhibit 2060).  ICCMH also established seven regional councils, and the regional councils then established local councils.  (Tr., p. 1389).  ICCMH established a local charter template, which sets forth the responsibility of the local councils along with the duties, powers, goals and outcomes to be achieved by the local counsels.  (Exhibit 2062).  The Court finds that DHW substantially complied with Action Item 4A.

**4C:   By March 1, 2002, seven local councils will be operational.  DHW will be responsible for taking the lead in establishing the local councils.  The ICCMH, on an on-going basis, will evaluate and identify the need for additional councils in each regional area in order to increase family access to a local council**.

Seven local councils were operational by March 1, 2002.  (Tr., p. 1705).

The Court finds that DHW substantially complied with Action Item 4C.

**4D:   By August 1, 2001, DHW will identify operating and**

Findings of Fact and Conclusions of Law - 22

**trustee/benefit funds that can be accessed by local councils.  The ICCMH will establish criteria for local councils to access those funds.  Expenditures of these funds on behalf of local councils will be tracked and reported to the ICCMH through annual reports prepared by the individual local councils**.

DHW directed the budget analyst working with the children's mental health budget to set aside in each region $50,000 yearly and identify the same as local council funds, and to set aside an additional $135,000 yearly for ICCMH.  (Tr., p. 1390).  The funding criteria set forth by the ICCMH and provide specific information and direction to regional and local councils about how they can access the $50,000 yearly.  (Exhibit 2066; Tr. p. 1390).  The funding guidelines require compliance with the State Board of Examiners requirements for any purchases or expenditures.  (Tr., p. 1391).  The $50,000 provided for local councils is given each year in each of the seven regions.  (Tr., p. 1392).  Although it is unclear whether DHW met its August 2001 deadline, DHW did identify funds by no later than May 2002.  The Court finds that DHW substantially complied with Action Item 4D.

**4E:    Each local council will develop a memorandum of agreement with participant members/agencies that delineates respective responsibilities, decision-making protocols, referral processes, treatment options, service protocols, confidentiality, fiscal management, and collaborative philosophy.  Local councils should begin development of the memorandum of agreement immediately after the council is identified and should be prepared to begin implementing the agreement by March 1, 2002, or within**

**six months of council establishment.  DJC's district liaisons will
be given this assignment for DJC**.

ICCMH determined in March 2002 (Exhibit 2070, p. 6) and on April 16,

2002 (Exhibit 2034, p. 7) that the Memorandum of Agreements would be in the

form of "charters."  Exhibit 2062 contains the local charter template and outlines

the duties, responsibilities and other activities of local councils.  Plaintiffs failed to

present clear and convincing evidence that the defendants failed to comply with

any specific and definite requirements of the defendants related to this Action Item,

and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the

extent DHW had requirements under the Action Item, DHW substantially complied

with those requirements.

> **4F:    Progress of the councils will be evaluated on an on-going basis by
> each council and will be monitored by the ICCMH through
> review of documents, including the memorandum of agreement,
> parent satisfaction surveys, and through site reviews to assure
> they meet the requirements set forth by the state council.  The
> local councils will submit a pre-operational progress report to the
> ICCMH.  The ICCMH will establish timelines for regular
> monitoring**.

ICCMH evaluated the performance and progress of counsels as evidenced

by Exhibit 2074.  As testified to by Mr. Halligan, this exhibit is an evaluation

report by Rick Phillips from the Idaho Child Welfare Research and Training Center

who is under contract with DHW to assist in the evaluation that is required under

**Findings of Fact and Conclusions of Law - 24**

the cooperative agreement, which is the children's mental health grant from the Federal Government.  (Tr., p. 1394-95).  Evaluations of the councils on behalf of ICCMH also occurred as reflected in the Cliff Davis Technical Assistant Report.  (Exhibit 2075.2).  Phillips undertook another evaluation on the demonstration site, Regions 1, 3 and 7 dated October 2002.  (Exhibit 2076).  This document is also known as the Eastern Washington University Evaluation.3.        As set forth in Exhibit 2072, regional counsels were to provide leadership by facilitating technical assistance, monitoring, evaluating, and reporting with respect to the progress of all local counsels.  (Tr., p. 1394).  The Court finds that DHW substantially complied with Action Item 4F.

> **4H:**   **By September 1, 2001, ICCMH will develop an educational process for communities to inform them of the value of local councils as a method of accessing children's mental health services.  See also recommendation 10**.

ICCMH developed a social marketing plan, Exhibit 2038, and Exhibit 2037 educating communities and informing them that the needs of children with SED are best met with utilization of systems of care and education of parents together with services and support in their own community.  (Tr., p. 1397).   Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the

**Findings of Fact and Conclusions of Law - 25**

extent DHW had requirements under the Action Item, DHW substantially complied with those requirements.

> **4I:** **The ICCMH will submit a written report annually to the Governor, in sufficient time to be included in the consideration of the budgetary process for the up-coming fiscal year.  The report will include specific information on the expansion of the six core services.   The report will be made available to the Idaho Legislature and the public, identifying the progress and barriers for council development and a corrective action plan to address identified gaps and deficiencies in the system of care for children with SED and their families.  This action item may coincide with the Community Report Card referenced in recommendation 45. The annual report will also be sent to the State Planning Council on Mental Health**.

As testified to by Mr. Halligan, Exhibit 2078 is the ICCMH report to the Governor from 2001-2005, and Mr. Halligan assisted ICCMH in preparing the report by providing information to them, editing the document, and providing background information for the document when requested.  (Tr., p. 1524-25).  As set forth in the Governor's reports, there is information from each agency, council development, and progress in implementing a system of care.  The Governors' reports are also available to the public and the legislature and are also posted on the ICCMH website.  (Tr., p. 1524-25).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had

**Findings of Fact and Conclusions of Law - 26**

requirements under the Action Item, DHW substantially complied with those

requirements.

> **4J:** **Federal IDEA legislation requires school districts to enter into interagency agreements as needed, to promote coordination and timely delivery of appropriate services to IDEA eligible students. Local council memoranda of agreement will meet this requirement.  During the next three years, DHW and SDE will work together through the school districts to develop interagency agreements for families to access mental health services through local councils where appropriate and according to set access protocols**.

ICCMH determined in March 2002 (Exhibit 2070, p. 6) and on April 16,

2002 (Exhibit 2034, p. 7) that the Memorandum of Agreements would be in the

form of "charters."  Exhibit 2062 contains the local charter template with school

district representation and requires that members such as the Department and State

Department of Education work together to provide timely, collaborative,

individualized case planning.  The State Department of Education is a member of

ICCMH.  ICCMH developed a regional/local council workshop to address the

Action Items related to council Action Items in the court plan.  Exhibit 2085 sets

forth the work group report and membership list.  (Tr., p. 1399-1400).  Exhibit

2028, the School Mental Health Standards, was drafted by Mr. Edmunds.  (Tr., p.

1828).  The Department and the State Department of Education through the school

districts worked to development interagency agreements for families to access

**Findings of Fact and Conclusions of Law - 27**

mental health services through local councils.  This Action Item has been

completed by the Department, despite the fact that the State Department of

Education has taken the position it lacks authority to compel the school districts to

follow a particular standard.  The Court finds that DHW substantially complied

with Action Item 4J.

**4K:   Regional Councils will be chartered and operational by July 1, 2002**.

The regional councils were chartered and operational in each region by May

2, 2002, and they were effective and operational by March 1, 2002.  (Tr., p. 1705).

The Court finds that DHW substantially complied with Action Item 4K.

**4M:   Clarification of the role of the Regional and Local councils to provide information to their communities**.

ICCMH approved a communication strategy and DHW developed a "social

marketing plan" and numerous multimedia methods to use as outreach tools.  (Tr.,

p. 1484).   However, this does not necessarily clarify the role of the Regional and

Local councils.  Plaintiffs failed to present clear and convincing evidence that the

defendants failed to comply with any specific and definite requirements of the

defendants related to this Action Item, and therefore Plaintiffs failed to meet their

burden of proof.  Moreover, to the extent DHW had requirements under the Action

Item, DHW substantially complied with those requirements.

**Findings of Fact and Conclusions of Law - 28**

**4O:    DHW will develop recommendations for a quality assurance mechanism for monitoring issues arising out of the councils that need resolution**.

The local evaluation process is done through a contract released through Eastern Washington University.  (Tr., p. 1706).  Over the past three years, Dr. Richard Phillips developed surveys of each local council chairs with a structured questionnaire designed to measure how closely the councils are functioning in accordance with the principals and values of the system's care.  (Tr., p. 1707). DHW assists in meeting with regional chairs to resolve issues and bring them to ICCMH if they cannot be resolved at the regional chairs meetings.  (Tr., p. 1401). The Court finds that DHW substantially complied with Action Item 4O.

**5A:    By July 1, 2001, the ICCMH will review other state models to see how they have used local councils to administer services for Children with SED.  This information will be used by the council in developing its charge to local councils.  This educational process may include accessing technical assistance from states that already have existing systems of care**.

In May 2001, ICCMH was provided information from the Children's Mental Health Programs operational in other states.  (Tr., p. 1405).  Mr. Halligan was the supervisor of the work groups in the children's mental health program and gathered the information about other states' models involving local councils.  (Tr., p. 1405-06).  The Court finds that DHW substantially complied with Action Item 5A.

**Findings of Fact and Conclusions of Law - 29**

**5B:**   **By September 1, 2001, the ICCMH will establish consistent statewide guidelines for authorization of local councils to review individual cases, make treatment recommendations and identify funding for services within those guidelines**.

ICCMH established guidelines for local councils to conduct staffing and review of individual cases, make service recommendation and provide funding for services be subject to the requirements of the individual agency that provided the service as approved by the ICCMH.  (Exhibit 2082).  The latest version of how local councils serve families is set forth in the Idaho Systems of Care for Children's Mental Health Practice Model.  (Exhibit 2060; Tr., p. 1408).  The Court finds that DHW substantially complied with Action Item 5B.

**5C:**   **By March 1, 2002, local councils will establish consistent access protocols for authorizing review by the local councils based on the guidelines established by the ICCMH above.  The access protocol will include a mechanism which will trigger local council review, [*where appropriate and legally allowed,*] prior to commitment to SHS or DJC, or before out-of-state or long-term residential treatment options are approved**.

As Mr. Halligan testified, the business practice model facilitates Action Item 5C and if parents want to go through the local council process prior to their child being committed to State Hospital South or DJC or other long-term residential care, they can request action to the council.  (Tr., p. 1410-11).  As set forth in Exhibit 2159, the local council minutes for July 24, 2001, at page 5, the ICCMH established the regional/local council work group and, as set forth in Exhibit 2080,

**Findings of Fact and Conclusions of Law - 30**

the work group report identified local council protocols and processes for case review.  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had requirements under the Action Item, DHW substantially complied with those requirements.

**5D:  DHW, DJC, and SDE legal counsel will develop an appeals process for families denied services through local councils and ensure that agency staff and families are familiar with the process**.

Appeals for denial of services occur through the individual agency that denies the service.  (Tr., p. 1411).  Information about the appeals process used by DHW is provided to parents at the time of application, and in the event a parent is denied services, they are advised in the letter of their appeals rights.  The appeal rights are also contained in the parent guide.  (Exhibit 2027; Tr., p. 1412).  The Court finds that DHW substantially complied with Action Item 5D.

**6A:  By July 1, 2001, the ICCMH will establish a workgroup led by SDE, with specific directions to develop recommendations for using schools to improve identification of children with mental health needs and to improve a base for service delivery**.

ICCMH and State Department of Education established a school work group (Exhibit 2084; Tr., p. 1817).  The State Department of Education was the lead agency in charge of the recommendation.  (Tr., p. 1818).  Exhibit 2085 is the

**Findings of Fact and Conclusions of Law - 31**

report prepared by the work group and contains the recommendations of the work

group.  (Exhibit 2085; Tr., pp. 1819-1821).  Plaintiffs failed to present clear and

convincing evidence that the defendants failed to comply with any specific and

definite requirements of the defendants related to this Action Item, and therefore

Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had

requirements under the Action Item, DHW substantially complied with those

requirements.

> **6B:    Recommendations should be presented to the Council by July 1,**
> **2002, and should focus on models of other states, identification of**
> **space availability, transportation issues, seasonal issues and**
> **methods of integrating services and education**.

The recommendations were submitted to the ICCMH on July 1, 2002.

(Exhibit 2085).  The Court Finds that DHW substantially complied with Action

Item 6B.

> **9A:    By March 1, 2002, the ICCMH will research and set minimum**
> **standards for accountability, outcomes and management that will**
> **be consistent statewide.  Standards will be articulated in writing**
> **and will be in place prior to establishing local councils (March 1,**
> **2002).  Local councils will develop memoranda of agreement to**
> **reflect these standards**.

Minimum standards were set for accountability outcomes in management on

a statewide basis.  (Exhibit 2080).  The work group report was prepared in order to

address all regional and local council Action Items that were identified in the court

plan.  (Tr., p. 1409).  All of the recommendations were approved by ICCMH.  (Tr., p. 1410).  The Court finds that DHW substantially complied with Action Item 9A.

**9B:   DHW will develop policies that reflect best practices on service delivery**.

DHW developed the following policies that reflect best practices on service delivery: School Mental Health Standards (Exhibit 2088); Family Involvement Standards (Exhibit 2026); Protocol (Exhibit 2090); Utilization Standards, Exhibit 2091; Therapeutic Foster Care Standards (Exhibit 2092); Outpatient Service Standards (Exhibit 2093); Inpatient Hospitalization Standards (Exhibit 2094); Family Support Service Standards (Exhibit 2095); Clinical Case Management Standards (Exhibit 2096); Assessment and Evaluation Standards (Exhibit 2097); Early Identification Standards (Exhibit 2098); Residential Treatment Standards (Exhibit 2099); Respite Care Standards (Exhibit 2100); Course Service Standards Training Agenda (Exhibit 2101).  The Court finds that DHW substantially complied with Action Item 9B.

**10A:  By September 1, 2001, the ICCMH will develop a plan for providing outreach, technical assistance and training to communities for the development of local councils.  The plan will include use of "Policy Academies" for each region.  In addition, by September 1, 2001, the Council will identify resources for on-going technical assistance in designing, managing and evaluating integrated systems of care.  These may include national experts and area universities**

The ICCMH policy academy was held and named "The Regional and Local Council Orientation." (Exhibit 2080). DHW entered into contracts with Eastern Washington University to provide technical assistance to local councils. (Exhibit 2103). The Court finds that DHW substantially complied with Action Item 10A.

**10B: Information and training on local council development will be presented at the statewide Children's Mental Health Conference, September**

The statewide Children's Mental Health Cinference was held in September 2001. (Exhibit 2105; Tr., p. 1417). Workshops were held and information and training with respect to local council development was presented at the conference. (Exhibit 2105; Tr., p. 1417). The Court finds that DHW substantially complied with Action Item 10B.

**11A: DHW and DJC, with cooperating school districts, will explore the use of after-care advisory committees for each county for children who are being transitioned back to their community.**

DHW created the Children's Mental Health/Juvenile Justice Protocol (Exhibit 2059). Additionally, the business practice model provides a method for assisting youth and transitioning them back into the community. (Exhibit 2060). Both DJC and DHW use the "referral and release to children's mental health services program" for making referrals. (Exhibit 2059). The Court finds that DHW substantially complied with Action Item 11A.

**Findings of Fact and Conclusions of Law - 34**

**11C:  DJC will assist DHW by communicating with county probation and magistrate judges about community resources that may provide alternatives to DJC commitment or placement in county detention for a juvenile with SED**.

DHW's participation in meetings with local judges is reflected in the Juvenile Justice Advisory Team of Magistrate Judges list of materials.  (Exhibit 2109).  The Juvenile Justice/Children's Mental Health Collaboration Work Group document contains the list of agencies, individuals and community resources providing alternatives to DJC commitment.  (Exhibit 2058; Tr., p. 1422).  Mr. Edmunds testified that the Idaho Association of Juvenile Justice Administrators communicates by e-mails and provides minutes and agendas as a means of providing updates.  (Exhibit 2373; Tr., p. 1421).  Mr. Halligan testified that at the Juvenile Justice Magistrate Advisory Team meetings, he discussed how judges can access children's mental health services in the community through the voluntary process and gathered the magistrate's perspective of wanting to order services.  (Tr., p. 1423).  The Court finds that DHW substantially complied with Action Item 11C.

**11D:  Local judges will be periodically apprised of new information, resources, and community based services available to them for their consideration in sentencing**.

In 2005, the Idaho State legislature enacted Idaho Code § 20-511(A). (Exhibit 2405).  Section 20-511(A) provides a procedure for obtaining prompt

assessment and treatment of the mental health needs of a juvenile at any stage of

the legal proceedings.  Mr. Halligan testified that he discussed section 20-511(A)

with Sharon Burke and Judge Varin, and he discussed the language and process

and how the law might work and testified at community hearing related to the bill

in favor of Senate Bill 1165. (Tr., p. 1426).  Senate Bill 1165 allows a court to

convene a screening team, drawn from a wide range of agencies, including a

child's parents or guardians, in order to provide recommendations and options for

the court.  If a judge orders a plan of treatment, the court can also order DHW to

fund the mental health services identified in the court plan.  (Tr., p. 1424).  The

Court finds that DHW substantially complied with Action Item 11D.

> **11E:  DJC and DHW will develop a workgroup to explore the need for a
> change to current rules or statutes to create a diversion program
> to prevent children with SED from being committed to state
> institutions or facilities where appropriate less restrictive
> treatment options are available**.

Mr. Halligan assisted in changing Idaho law.  (Exhibit 2405; see also

analysis of Action Item 11D above).  The Court finds that DHW substantially

complied with Action Item 11E.

> **11F:  DHW and DJC will develop a communications mechanism to
> inform the courts and other justice officers know about the local
> councils and how to access them**.

See analysis of Action Item 11C above.  However, other than random

**Findings of Fact and Conclusions of Law - 36**

emails, DHW has not created a mechanism to inform courts and other justice officers about the local counsels and how to access them.  Accordingly, the Court finds that DHW has not substantially complied with Action Item 11F.

**12A:  During 2001, DHW will begin using Utilization Management's information system to track all children's mental health services provided by the Department**.

The Idaho State Legislature curtailed further development of Utilization Management throughout the state.  (Exhibit 2403; Tr., p. 1506).  DHW uses three information systems to pull information regarding children's mental health programs:  FOCUS, IDEA and Service Evaluation Database. (Tr., p. 1848).  That information system is used to track services.  (Tr., p. 1846).  The Court finds that DHW substantially complied with Action Item 12A.

**12B:  By July 1, 2001, the ICCMH will review common data elements currently being used by the demonstration sites and use these as a basis to identify common data elements to be tracked by all local councils**.

Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**12D:  The local council memorandum of agreement should include the agreement on the part of the participating agencies to provide**

> **agreed upon data.  See also, recommendation 45 regarding the establishment of key indicators to be monitored through the development of a Community Report Card**.

The local council charter template requires local councils to conduct operations consistent with ICCMH standards and guidelines (Exhibit 2062).  The template requires the council bylaws to address record keeping requirements/data collection.  (Exhibit 2062).  Expenditures and utilization tracked by DHW are contained in the annual Community Report.  (Tr., p. 1872-73; Exhibit 2141). Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof. Moreover, to the extent DHW had requirements under the Action Item, DHW substantially complied with those requirements.

> **13A:  The SDE will examine the barriers, statutory requirements and impact of current resource structures for serving students who are emotionally disturbed and make recommendations to policy makers.  An example of a change to the current structure would be possibly increasing the current ED excess cost allowance**.

Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**13B:  School districts will participate with DHW and DJC at the local level in the development of interagency agreements that will include a description of each agency's resource commitments to services to ED students**.

DHW enters into contracts with school districts for day treatment. (Tr., p. 1622).  The contracts are considered interagency agreements. (Tr., p. 2056).  The Court finds that DHW substantially complied with Action Item 13B.

**14B:  By December 1, 2001, the workgroup will report to the ICCMH on their findings and recommendations**.

The DHW Cross-Program Workgroup developed recommendations. (Tr., p. 1901; Exhibit 2118).  The recommendations were presented to ICCMH on January 15, 2002. (Exhibit 2119).  The Court finds that DHW substantially complied with Action Item 14B.

**14D:  DHW will identify a method for identifying this population of children and look at tracking it in the future data development and reports**.

DHW uses three main information systems to pull information regarding children's mental health programs:  FOCUS, IDEA and Service Evaluation Database. (Tr., 1848-49).  FOCUS manages information on all individual cases that receive services through the children's mental health program. (Tr., p. 1848-49). The Court finds that DHW substantially complied with Action Item 14D.

**15A:  Utilization management will develop rules, policies and**

> **procedures for standardizing the definitional, reporting and payment processes for both Medicaid and non-Medicaid children's mental health services.  Family and Children's Services staff will continue to provide input into the Utilization Management planning to address the needs of children with SED. It is estimated that Utilization Management will begin managing children's mental health services by July 1, 2001**.

The Idaho State legislature curtailed further development of Utilization Management throughout the state. (Tr., p. 1506).  DHW took other steps to comply. (Tr., p. 1506).  DHW promulgated rules setting forth charges to parents. (Tr., p. 1506).  IDAPA rules 16.06.01.642, .643 and .645 address access to services, charges to parent(s) or legal guardian(s) and fee determination for services other than out-of-home care and also governs polices and procedures for reporting and payment of non-Medicaid children's mental health services. (Exhibit 2123).  Medicaid rules are in existence and address Medicaid services for definitions and reporting and payment. (Tr., p. 1507; Exhibit 2125).  DHW standardized definitions and measurements for core services. (Tr., p. 1507; Exhibit 2124).  The Court finds that DHW substantially complied with Action Item 15A.

> **15B:  Another recommendation (15) addresses the need to improve the use of the Clinic Option through tracking and prior authorization of this service**.

The Clinic Option is a Medicaid program which provides outpatient mental health services to children.  A child does not need to have a serious emotional

**Findings of Fact and Conclusions of Law - 40**

disturbance to receive clinic services.  (Tr., p. 1508-09).  Prior authorization is not

required to utilize the Clinic Option.  (Tr., p. 1509).  DHW tracks the utilization of

clinic option services.  (Tr., p. 1906).  The Court finds that DHW substantially

complied with Action Item 15B.

> **16A:  By October 1, 2001, DHW will review and evaluate provider agreements for potential revision to assure standardization and accountability for services in alignment with Utilization Management**.

The Idaho State legislature curtailed further development of Utilization

Management throughout the state.  (Tr., p. 1506; Exhibit 2403).  DHW took other

steps to comply. (Tr., p. 1506).  A process of redesigning the provider agreement

began. (Tr., p. 2166).  The provider agreement includes standards for quality

assurance, safety, ethics and documentation. (Tr., p. 2167).  The PSR agreement

was redesigned setting up additional standards and establishing a credential

standard. (Tr., p. 2168).  The Court finds that DHW substantially complied with

Action Item 16A.

> **17A:  By December 1, 2001, DHW will research the effectiveness and feasibility of using videoconferencing for provision of children's mental health services, taking into account the effectiveness of treatment, confidentiality issues and cost effectiveness.  Other issues to be explored include the barriers and strategies for increasing third party reimbursements for medically/clinically related services provided via videoconferencing**.

DHW personnel attended a meeting at Idaho State University Institute of Rural Health in 2001 or 2002 about using their teleconferencing ability for training. (Tr., p. 1510).  DHW periodically accesses the ISU Institute of Rural Health teleconferencing network and provides training. (Tr., p. 1511).  A proposal for telehealth funding was developed for Medicaid. (Tr., p. 1511; Exhibit 2128). DHW has a pilot program in the Treasure Valley that uses videoconferencing as a way to communicate amongst physicians; primarily uses the expertise of a child psychiatrist to communicate with a primary care and pediatric physicians on how to meet the mental health needs of a child.  (Tr., p. 2024).  DHW has a contract with St. Luke's Regional Medical Center to provide in part monthly informational sessions and use videoconferencing to broadcast meetings throughout state.  (Tr., p. 2028; Exhibit 2130).  The Court finds that DHW substantially complied with Action Item 17A.

**17B:  The parties agree to review the videoconferencing recommendation at the review in May of 2003**.

The DHW contract with St. Luke's Regional Medical Center is an annual contract with an expiration date of January of 2007. (Tr., p. 2025; Exhibit 2130). St. Luke's Regional Medical contract has a videoconferencing component. (Tr., p. 2028; 2130).  Exhibit 2136 is the 2006 PSR videoconferencing training schedule.

**Findings of Fact and Conclusions of Law - 42**

(Exhibit 2136).  The Court finds that DHW substantially complied with Action

Item 17B.

> **18A:  DHW will continue to meet with private providers to explore**
> **barriers and incentives to use the Rehabilitation Option, including**
> **mileage reimbursement for travel to rural areas and the potential**
> **expansion of service provision through the use of**
> **videoconferencing referenced in recommendation 17**.

Exhibit 2427 is a Mental Health Authority PSR Proposal (Exhibit 2427).

This document is a proposal by the PSR operations team about how the PSR

operations team will function, its purpose, its membership and its procedures. (Tr.,

p. 1907).  The membership/committee includes Medicaid, parents and private

providers.  (Tr., p. 1907).  The DHW Rehabilitation Option Operations Team

reviews interpretation of policies, makes recommendations, hears what groups feel

would be improvements in the PSR program and make recommendations for those

changes to Medicaid.  (Tr., p. 1907-08).  There now exists a Medicaid rule which

allows mileage reimbursement by a private provider when transporting a

participant which came about as a result of negotiations with provider association.

(Tr., p. 2172-74).  A proposal for telehealth funding was developed for Medicaid.

(Tr., p. 1511; Exhibit 2128).  There is a pilot project wherein videoconferencing is

being used to broadcast educational meetings. (Tr., p. 2024).  Technology is being

used to deliver expertise and consultation to family physicians.  (Exhibit 2132;

Exhibit 2133). The Court finds that DHW substantially complied with Action Item 18A.

> **18B:  DHW will continue, through Utilization Management, to develop and train providers to serve children under the Rehabilitation Option**.

The Idaho State legislature curtailed further development of Utilization Management throughout the state. (Tr., p. 1506; Exhibit 2403).  DHW took other steps to comply. (Tr., p. 1506).  Exhibit 2137 is a 2005 "PSR Assessment and Treatment Planning from a Strengths-Based Perspective" flyer for a program in Boise. (Exhibit 2137).  DHW Region VI provided PSR training on a number of occasions on how to do comprehensive assessments, how to develop appropriate treatment plans, their roles and responsibilities for delivering services and one on one consultation for specific workers on individual cases. (Tr., p. 1535).  DHW Region VI provides PSR training on an "as need" basis.  (Tr., p. 1536).  DHW Region II has provided PSR training on CAFAS/PECFAS, early identification assessment and treatment, "Managing Unruly Behavior" and providing parent management. (Tr., p. 1661-62).  In 2006, DHW is sponsoring PSR Trainings in conjunction with Idaho State University Institute of Rural Health and Telehealth Idaho through videoconferencing.  (Tr., p. 1915-16; (Exhibit 2134).  The Court finds that DHW substantially complied with Action Item 18B.

**Findings of Fact and Conclusions of Law - 44**

**18C:  Any recommendation that may result in the expansion of Medicaid is held until the budget restraints are lifted; these recommendations will continue to be reviewed**.

Idaho has implemented significant Medicaid Reform under the new federal laws, allowing Idaho to set up different benefits for different target populations. (Tr., p. 2103).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**19B:  During 2001, DHW will determine the feasibility of accessing the Home and Community Based Services (HCBS) waiver under Medicaid from the federal government for children with SED**.

Idaho currently has two home- and community-based waivers. (Tr., p. 2103). Under the new federal law, the federal government is allowing home and community-based services in a state plan.  (Tr., p. 2104).  That section of the law goes into effect January of 2007. (Tr., p. 2105).  Idaho is considering two options (waiver or include benefit in state plan). (Tr., p. 2106-07).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had requirements under the Action Item, DHW substantially complied with

**Findings of Fact and Conclusions of Law - 45**

those requirements.

**19C:  By July 1, 2002, a workgroup will be established to explore the feasibility of making changes to the Katie Beckett waiver, with the possibility of making recommendations to the ICCMH around this waiver**.

Exhibit 2139 is a Notice of Negotiated Rule-making on Home Care for Certain Disabled Children (Katie Beckett) Medicaid Program.  (Tr., p. 2110; Exhibit 2139).  The Notice is formal notice when Medicaid wishes to enter negotiated rules.  (Tr., p. 2110).  Meetings took place. (Tr., p. 2110).  Because this would be an expansion of the program, savings would need to be found to offset the expansion.  (Tr., p. 2111).  Since there was no way to offset the expansion, it was placed on hold.  (Tr., p. 2111). A workgroup was established in 2002 and explored the feasibility of changes to the Katie Beckett waiver.  (Tr., p. 1522-24).  The Court finds that DHW substantially complied with Action Item 19C.

**21A:  DHW, SDE and school districts will continue collaborative efforts to increase the number of school districts billing for Medicaid reimbursable services**.

In 2002 Medicaid worked with Department of Education and school districts to bridge the gulf between education rules, bureaucratic rules and Medicaid bureaucratic rules.  (Tr., p. 2114).  After significant rewriting of Medicaid rules, school district participation went from 40 participants to over 90.  (Tr., p. 2115).

**Findings of Fact and Conclusions of Law - 46**

The Court finds that DHW substantially complied with Action Item 21A.

**21B:  DHW and SDE will identify the critical elements for consistent Medicaid reporting**.

In addition to the rule rewrite, Medicaid staff joined with Department of Education and went to school districts, going over policy and procedures and how to bill. (Tr., p. 2117).  Most school districts have changed to a third party administrator. (Tr., p. 2115).  School district participation went from 40 participants to over 90.  (Tr., p. 2115).  The Court finds that DHW substantially complied with Action Item 21B.

**21C:  During 2001, SDE will assist in distributing the Medicaid manual to all school districts and will work collaboratively with the school Medicaid office to provide training, technical support and encouragement in the use of the manual**.

Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**22A:  New general funds for children's mental health services will be allocated to the regions based on a poverty youth population formula in order to better reflect size and resource differences among the regions.  Consideration may also be given in the allocation formula to those regions with state institutions providing care for large populations of juvenile offenders in the custody of DJC.  The money available to pay for services to**

**Findings of Fact and Conclusions of Law - 47**

**children and families will be used by the regions to develop a base
of core services outlined in the program development
recommendations 25-41**.

DHW requested an increase in appropriations and staff for CMH services for

fiscal year 2002.  (Tr., pp. 820-23).  Exhibit 2278 is the 2001 Idaho Legislative

Fiscal Report.  (Exhibit 2278).  The report shows that the DHW CMH program

received fifteen FTPs for fiscal year 2002.  (Tr., p. 818).  Exhibit 2279 is the Idaho

Legislative Budget Book for the 2001 Legislative session.  (Exhibit 2279).  The

document provides the agency's request and the Governor's recommendation for a

Foster Care rate increase at No. 1, pp. 2-17.  (Tr., p. 820).  Exhibit 2279 also shows

that DHW requested funding for fifteen new staff members for fiscal year 2002 and

that the department would follow up the next year with a request for an additional

ten FTPs.  (Exhibit 2279).  DHW was requesting twenty-five FTPs, but was not

requesting the total in that legislative session.  (Tr., p. 822).  Exhibit 2279 also

shows that DHW requested additional funding in the amounts of $350,000 for a

pilot project and $135,000 to provide funding to implement collaborative

recommendations in the Needs Assessment.  (Tr., p. 823).  Exhibit 2275 is the

Legislative Budget Book for fiscal year 2003.  This document shows that DHW

requested the additional ten FTPs that were mentioned in the previous year's

Budget Book and is referenced in Action Item 27A.  (Tr., p. 824-25).  Exhibit 2286

**Findings of Fact and Conclusions of Law - 48**

is the Legislative Fiscal Report for the 2002 session.  (Exhibit 2286).  The

document provides the fiscal year 2003 appropriation for children's services.  (Tr.,

p. 826).  This document shows that DHW received the funding to fill the ten FTPs,

but the Legislature did not provide additional FTP as the department had FTPs that

were vacant that could be used for these staff positions.  (Tr., p. 827).  Exhibit 2285

is the Idaho Legislative Fiscal Report showing appropriations for fiscal year 2004

for children's services.  (Exhibit 2285).  This document shows that DHW requested

and received an appropriation to provide an increase in the Foster Care

reimbursement rates.  (Tr., p. 828-30).  Exhibit 2280 is the Idaho Legislative

Budget Book for the 2004 legislative session.  (Tr., p. 830-31).  This document

shows that DHW received a federal grant for planning and coordinating CMH

services.  (Tr., p. 831).  The grant was also to work with the community-based

councils and others to expand CMH services. (Tr., p. 832).  There were also three

staff positions associated with the grant.  (Tr., p. 832).  The exhibit also shows that

an additional seven clinical positions were added in the CMH program to provide

community-based treatment services.  (Tr., p. 832).   An additional increase in

Foster Care rates was also included in this appropriation for fiscal year 2005.  (Tr.,

p. 832).  Exhibit 2281 is the Legislative Budget Book for fiscal year 2006.  (Tr., p.

833).  This document shows that DHW requested the reinstatement of the thirteen

**Findings of Fact and Conclusions of Law - 49**

and a half clinical positions that had been removed due to the previous budgetary

holdbacks.  (Tr., p. 834).  The Governor recommended the reinstatement of the 13.5

FTPs.  (Tr., p. 834).  DHW also requested an additional $1,157,000 in general funds

for additional Trustee and Benefit resources to provide CMH services.  (Tr., p. 834).

 Trustee and Benefit funds are funds appropriated to the department to use on behalf

of others, to provide the actual CMH services to the children and families.  (Tr., p.

836-37).  The Governor included the increase for Trustee and Benefit in his

recommendations.  (Tr., p. 835).  Exhibit 2282 is the Legislative Fiscal Report for

fiscal year 2006.  (Tr., p. 836-37).  This report shows the creation of a new budget

program specifically for CMH for fiscal year 2006.  (Tr., p. 836).  The new budget

established for the CMH program includes $11,422,100 in general fund for Trustee

and Benefit, and a total budget of $12,713,600.  (Tr., p. 836).  The CMH

appropriation for fiscal year 2006 also included seven additional FTPs, $1,571,000

in new general funds, and an additional $128,500 in federal spending authority, for

a total of $1,699,600 in new appropriations for the CMH program.  (Tr., p. 837).

Exhibit 2282 explains that prior to the creation of this specific CMH program

budget, appropriations for the CMH program were included with appropriations for

the Child Welfare program in a budget called "Children's Services."  (Tr., p. 838).

When the Legislature created the new CMH program budget, it removed funding

**Findings of Fact and Conclusions of Law - 50**

and FTP from the Children's Services budget to create the new CMH program

budget.  (Tr., p. 838).  When the Legislature created the new CMH program budget,

they also included some specific legislative intent language in the appropriations

bill.  (Tr., p. 841).  This language stated that oversight of the federal Cooperative

Agreement was to be done by the ICCMH and that the ICCMH was to oversee the

implementation of the plan and legislative policy for the provision of access to

treatment and services for children with SED.  (Tr., p. 841-42).  This was included

in the appropriations bill, HB 378, a copy of which is included in Exhibit 2282.

(Tr., p. 842; Exhibit 2282).  Exhibit 2283 is the Idaho Legislative Fiscal Report for

fiscal year 2007.  (Tr., p. 844).  Within this exhibit is a copy of HB 836, the

appropriations bill for fiscal year 2007.  (Tr., p. 847).  The bill sets forth that

$12,858,700 was appropriated in general funds to the CMH program.  (Tr., p. 847).

Of the amount appropriated in general funds, $11,594,000 were Trustee and Benefit

funds for direct services to children.  (Tr., p. 848).  The total appropriated budget

for the CMH program for fiscal year 2007 was $19,498,100.  (Tr., p. 848).  Cliff

Davis testified that in addressing financial issues in the Needs Assessment that the

reference to the "dedicated Jeff D. funds" was referencing the initial $2.9 million in

state general funds that had been committed specifically to this population of

children.  (Tr., p. 1257; see Docket No. 308, p. 126.  Recommendation 22 called for

**Findings of Fact and Conclusions of Law - 51**

the department to double the dedicated Jeff D. funding.  The amount of the original

funds that were referred to in that recommendation is $2.9 million, or $450,000 per

region. (Tr., p. 1257-58).  That would mean the department needed to increase the

general funds appropriated to the CMH program to over $8.4 million.  The CMH

program was appropriated $12.8 million in general funds for fiscal year 2006 and

$13 million in general funds for fiscal year 2007.  (Exhibit 2283).  The CMH

program was appropriated $11.5 million for Trustee and Benefit for fiscal year

2007.  (Exhibit 2283).  Exhibit 2353 demonstrates the method that was utilized to

distribute new funds that were appropriated for fiscal year 2003.  (Tr., p. 2190).

This method included an analysis of the youth poverty population by region.  (Tr.,

p. 2190). New funds were distributed according to this method, but base budgets

were determined according to historical expenditures of each regional program.

(Tr., p. 2194-95).  Later, the fiscal management division determined to begin using

a method that took into account both the region's historical spending and the

number of cases being served as a more fair and equitable way of determining the

regional budgets.  (Tr., p. 2195-96).  Exhibits 1108 and 2362 are charts created by

DHW providing data on the provision of each core service, including the number of

children served, the source of the funding, and the amount of funding, both by

region and statewide.  Each region has developed a base of the core services.  The

**Findings of Fact and Conclusions of Law - 52**

baseline data is the data for fiscal year 2001.  Progress can be measured by

comparing each subsequent fiscal year data to the baseline year of FY 2001.  (Tr., p.

1945-46).  The Court finds that DHW substantially complied with Action Item 22A.

**22B:  The ICCMH will report annually to the Governor regarding
progress toward meeting recommendations of the Needs
Assessment set forth in the plan adopted by the federal court and
in implementing the Idaho Children's Mental Health Services Act.
This report will be available to the public and will be used to
make recommendations to the Governor regarding the need for
additional resources**.

ICCMH submits an annual report to the Governor.  (Tr., p. 1524-25; Exhibit

2078).  DHW staff is assigned to ICCMH to provide information when requested

and assists in editing the document. (Tr., p. 1525).  Plaintiffs failed to present clear

and convincing evidence that the defendants failed to comply with any specific and

definite requirements of the defendants related to this Action Item, and therefore

Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had

requirements under the Action Item, DHW substantially complied with those

requirements.

**22C:  DHW will provide the data and core service targets to the
ICCMH by December 1, 2002**.

DHW provides utilization data and CAFAS outcome scores and

family satisfaction for use in the community report card, but not core service

targets.  (Tr., p. 1621).  DHW creates its own service delivery goals.  (Tr., p.

1396; Exhibit 2077).  The DHW service delivery goals were created

regionally.  (Tr., p. 1675-76).  The Court finds that DHW substantially

complied with Action Item 22C.

> **22D:  The ICCMH will use the data and core service targets to make its recommendations on additional funding in the November report to the Governor for his consideration in making budget decisions**.

DHW provides utilization data and CAFAS outcome scores and family

satisfaction for use in the community report card, but not core service targets.

(Tr., p. 1621).  In 2001, the Idaho State legislature provided for seven

additional FTPs for the Jeff D settlement. (Tr., p. 814-15; Exhibit 2350).  In

2002, children's mental health services received 15 FTPs for Jeff D. (Tr., p.

818-19; Exhibit 2278).  In 2003, the legislature allowed DHW to find 10

existing positions to be used for the 10 FTPs Jeff D positions requested. (Tr.,

p. 826-28; Exhibit 2286).  Before the 2004 legislative session, the Governor

instituted a "holdback" for most state agencies. (Tr., p. 870).  In 2005, the

Governor requested reinstatement of 13 positions for 2006, which had been

removed. (Tr., p. 833-34; Exhibit 2281).  In 2006, an additional 7 FTPs were

added. (Tr., p. 837; Exhibit 2282).  DHW aided in the development of the

ICCMH's Report to the Governor and the Community Reports.  (Tr., p.

1712).  Exhibit 2078 includes copies of the ICCMH annual Reports to the

Governor from 2002 through 2005.  The Court finds that DHW substantially

complied with Action Item 22D.

> **23A:  It is recognized that additional funding will be needed to
> fully implement this plan.  The ICCMH, through its annual
> report, will make the initial recommendations for additional
> funding for these purposes.  The recommendations for new
> funds will be consistent with the sizing of service capacity for
> community-based services to serve children with SED.  New
> funding requests will be deferred until this data is available.
> See also recommendation 2.  Defendants will be making a
> request for new funds consistent with recommendation 27
> and the financing statements in the recommendations in this
> plan.  (This recommendation is not correct in the
> Implementation Plan as filed with the Court; Defendants'
> counsel has retrieved the correct language from an earlier
> draft of the plan to provide the Court with accurate
> language.)**

In 2001, the Idaho State legislature provided for seven additional FTPs

for the Jeff D settlement. (Tr., p. 814-15; Exhibit 2350).  In 2002, children's

mental health services received 15 FTPs for Jeff D. (Tr., p. 818-19; Exhibit

2278).  In 2003, the legislature allowed DHW to find 10 existing positions to

be used for the 10 FTPs Jeff D positions requested. (Tr., p. 826-28; Exhibit

2286).  Before the 2004 legislative session, the Governor instituted a

"holdback" for most state agencies.  (Tr., p. 870).  In 2005, the Governor

requested reinstatement of 13 positions for 2006, which had been removed.

(Tr., p. 833-34; Exhibit 2281).  In 2006, an additional 7 FTPs were added.

(Tr., p. 837; 2282).  Exhibit 2042 sets forth DHW children's mental health

services by service by region. (Exhibit 2042).  DHW aided in the

development of the ICCMH's Report to the Governor and the Community

Reports.  (Tr., p. 1712).  Exhibit 2078 includes copies of the ICCMH annual

Reports to the Governor from 2002 through 2005.  The Court finds that

DHW substantially complied with Action Item 23A.

> **23B:  The agencies will continue to monitor the savings that DJC may realize with the anticipated diversions of kids through the Local Councils and other mechanisms, as well as the statutory reduction of the age of the juvenile population that can be committed to their custody that went into effect this past legislative session**.

Plaintiffs failed to present clear and convincing evidence that the

defendants failed to comply with any specific and definite requirements of

the defendants related to this Action Item, and therefore Plaintiffs failed to

meet their burden of proof.

> **24A:  By August 1, 2001, DHW will identify funding to support state and local councils.  See recommendations 2 and 4**.

$50,000 was identified for local and regional councils and $135,000

for ICCMH by August 1, 2001. (Tr., p. 1525).  Funding for state council is

now $129,000.  (Tr., p. 1525-26).  The Court finds that DHW substantially

complied with Action Item 24A.

> **24B:** **Improvement of tracking and identification of resources**
> **expended on children with SED will come with the actions**
> **in recommendations 9 and 12 regarding implementation of**
> **management and evaluation practices**.

DHW has three systems to track children's mental health program

information:  FOCUS, IDEA, and Service Evaluation Database.  (Tr., p.

1848-49).  Expenditures can be tracked through IDEA and FOCUS. (Tr., p.

1849; 1857-58).  The Court finds that DHW substantially complied with

Action Item 24B.

> **25B:** **New funding for DHW would be allocated to the regions**
> **based on a poverty youth population formula in order to**
> **better reflect size and resource differences among the**
> **regions.  This funding will be used to develop and expand**
> **core services, including family support services in all**
> **regions consistent with the allocation formula**.

DHW allocated funds based upon total population, youth population

and poverty population. (Tr., p. 2190; Exhibit 2353).  DHW distribution of

funding now includes additional consideration of caseload.  (Tr., p. 2195-

96).  Plaintiffs failed to present clear and convincing evidence that the

defendants failed to comply with any specific and definite requirements of

the defendants related to this Action Item, and therefore Plaintiffs failed to

meet their burden of proof.  Moreover, to the extent DHW had requirements

under the Action Item, DHW substantially complied with those

requirements.

**25D:  From the baselines DHW will develop a method of
determining capacity and future targets by December 1,
2002**.

Baselines and targets have been developed by DHW. (Tr., p. 1945-46;

1950).  DHW regions developed service delivery goals for core services.

(Tr., p. 1675-76; 1952; Exhibit 2077).  This assists in determining capacity

for services.  (Tr., p. 1953).  However, DHW has not developed a method of

determining future targets.  (Tr., p. 1953).  The Court finds that DHW

substantially complied with Action Item 25D.

**25F:  The baseline data will be incorporated into the Community
report card**.

Baselines have been developed by DHW.  (Tr., p. 1945-46).

Expenditures and utilization tracked by DHW are contained in the annual

Community Report.  (Tr., p. 1872-73; Exhibit 2141).  The Court finds that

DHW substantially complied with Action Item 25F.

**26C:  By May 1, 2002, each region will have used the minimum
standards to develop and implement a regional crisis
response protocol and will provide a copy of the protocol to
the local councils in their region**.

A workgroup was formed related to regional protocols, but ICCMH did not instruct DHW to monitor crisis response protocols.  (Tr., p. 1526). The Court finds that DHW has not substantially complied with Action Item 26C.

**26D:  Implementation and adherence to regional protocols will be monitored by the ICCHM as part of their overall monitoring plan**.

ICCMH did not request DHW to monitor crisis response protocols. (Tr., p. 1526).  ICCMH delegated to regional councils the responsibility for monitoring the protocols.  (Tr., p. 1526).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**26F:  The parents guide will be updated at the next publication to include the new regional 800 numbers and information on crisis response**.

The updated parents guide has both local and 800 numbers as well as information on crisis response protocols.  (Exhibit 2146).  Parents Guides are sent to parents who are referred to Idaho Federation of Families.  (Tr., p. 539-40).  The Court finds that DHW substantially complied with Action Item 26F.

**Findings of Fact and Conclusions of Law - 59**

**26G:  The ICCMH will monitor the crisis response protocols for
        quality assurance purposes**.

ICCMH did not request DHW to monitor crisis response protocols.

(Tr., p. 1526).  ICCMH delegated to regional councils the responsibility for

monitoring the protocols.  (Tr., p. 1526).  Plaintiffs failed to present clear and

convincing evidence that the defendants failed to comply with any specific

and definite requirements of the defendants related to this Action Item, and

therefore Plaintiffs failed to meet their burden of proof.

**27A:  By September1, 2001, DHW will have consistent, statewide
        written procedures for informing families who request DHW
        children's mental health services of their options, rights, and
        responsibilities.  This includes notifying parents of their
        right to complete an Application for Services and offering
        parents a face to face appointment with a professional staff
        member.  At the time of application, the parents will be
        informed verbally and in writing of all of the eligibility
        requirements and of the right to and the process for, appeal
        if services are denied.  Parents will also be informed of the
        availability of family advocacy resources.  Parental
        notification will be documented by the parents' signature on
        a form acknowledging receipt of this information.  A family
        who declines an application or services will be asked to
        acknowledge what they were offered and their decision not
        to apply for or accept services.  The Plaintiffs' counsel will
        be notified of all denials of services**.

DHW developed a policy about what information is to be provided to

parent as a result of this action item.  (Tr., p. 1527; Exhibit 2148).  Exhibit

2148, FACSPM 01-05 effective September 1, 2001, "Information to be

provided to parent(s) at time of application for CMH services" requires the

following information to be provided to parents: the name, phone number and

address of family advocacy organizations operating in Idaho; that the parent

is to receive verbal eligibility information as well written eligibility criteria

provided with application; that the parent has a right to complete an

Application for Services, that the parent has a right to a face to face

appointment with a clinician, and that the parent has a right to receive

documents outlining both parent's and DHW's rights and responsibilities.

(Exhibit 2148).  The Application for Children's Mental Health Services,

Parental Rights and Responsibilities, DHW Rights and Responsibilities,

Eligibility Criteria, Family Advocacy Groups, Implementation Guidelines,

and Notice of Administrative Appeal Rights are attached to Exhibit 2148.

The information and applications are in both English and Spanish with a

signature line for parents to acknowledge receipt of verbal and written

information regarding appeal options, procedures and information on

obtaining legal representation, eligibility criteria for children to receive

Children's Mental Health Services, Parental and Departmental rights and

responsibilities related to application for Children's Mental Health Services,

**Findings of Fact and Conclusions of Law - 61**

and name, phone number and address of family advocacy organizations operating in Idaho.  (Exhibit 2148).  The policy requires any parent who inquires about children's mental health services, must be offered an application (Exhibit 2148).  DHW has a policy regarding denials if application is made, but the child is determined not eligible for children's mental health services.  (Tr., p. 2074; Exhibit 2150).  Denial letters received by DHW personnel are provided to DHW counsel.   (Tr., p. 2140).  The Court finds that DHW substantially complied with Action Item 27A.

**27B:  DHW develop an information brochure on how financial eligibility is determined and includes a sliding fee scale from the Rules Governing Family and Children's Services.  The developed brochure will be reviewed in collaboration with plaintiffs' counsel and family representatives**.

A draft brochure to meet this action item was prepared. (Tr., p. 1527-28; Exhibit 1428).  Parents receive eligibility criteria information in application process. (Tr., p. 1373).  Although a draft brochure was created, a final brochure was never created.  The Court finds that DHW has not substantially complied with Action Item 27B.

**27C:  By November 1, 2001, DHW will use methods of informal dispute resolution in conjunction with, or in addition to, the Department's appeals process**.

DHW has a policy for informal dispute resolution.  (Tr., p. 1372-73; Exhibit 2028).  Exhibit 2028 was effective September 10, 2001.  The Court finds that DHW substantially complied with Action Item 27C.

**27D:** **Beginning immediately with the use of current staff, DHW will use the Child and Adolescent Functional Assessment Scale (CAFAS) consistently statewide for all children whose parents apply for mental health services through DHW and those referred by the court or other agencies.  The CAFAS will be conducted by a clinician (masters level or above) and will form the basis for a comprehensive assessment which is used to create the child's task/services/treatment plan if the child is determined to be eligible for services.  New funding for additional staff will be used to expand the provision of this service.  DHW will begin immediately to track demographic and referral information and CAFAS scores for all children assessed for services.  With additional staff DHW will conduct assessments in a variety of non-clinic environments**.

DHW uses CAFAS.  (Tr., p. 27).  The Enterprise Data Warehouse contains demographic information. (Tr., p. 1852).  CAFAS scores are presently contained in the Service Evaluation Database. (Tr., p. 1896). FOCUS contains referral information. (Tr., p. 1853-54).  DHW distribution of funding now includes additional consideration of caseload. (Tr., p. 2195-96).  The Court finds that DHW substantially complied with Action Item 27D.

Findings of Fact and Conclusions of Law - 63

**27F:  DJC is also adding clinical staff as described in Recommendation 47.  This will increase DJC's ability to provide clinical services to youth in its custody**.

Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**27G:  By September 1, 2001, DHW will convene representatives from DJC, SDE, other interested community partners, and families o identify the components necessary for a multi-system assessment and plan for children accessing services through the local councils.  The assessment and plan will address the child's needs across agencies.  DHW will work with state and local agencies/entities to develop a quality assessment using the most appropriate tools for each referral**.

Regional/Local Council Workgroup Report was a multi system approach on how councils would work with families.  (Tr., p. 1528-29; Exhibit 2080).  A modification of the council staffing process was adopted in 2004.  (Tr., p. 1529; Exhibit 2160).  There is now a 2005 version of the business practice model.  (Tr., p. 1388-89; Exhibit 2060).  The 2005 model was adopted by ICCMH.  (Tr., p. 968).  DHW pledged to give 8 full-time positions to do case management.  (Tr., p. 968).  DHW expected support from other partners. (Tr., p. 969).  There are 8 dedicated positions across the

Findings of Fact and Conclusions of Law - 64

state, one in each region and 2 in Region IV.  (Tr., p. 968).  Region II

distributes the workload across entire staff. (Tr., p. 970-71).  Region VI has 5

clinicians trained in wraparound. (Tr., p. 1542).  Both Region II and Region

VI DHW Children Mental Health chiefs testified that DHW expects

wraparound process to be implemented in their region.  (Tr., p. 1542; 1667-

68).  No other agency has provided funds to hire more wraparound

specialists. DHW is the sole source of funding for current wraparound

specialists.  (Tr., p. 593).  The Court finds that DHW substantially complied

with Action Item 27G.

> **27H:  Tracking referrals will provide information regarding
> needed staffing levels and referral sources.  This information
> will be used to continuously modify the provision of services
> appropriately**.

FOCUS can be used for documenting referrals.  (Tr., p. 1876-77).

DHW distribution of funding now includes additional consideration of

caseload. (Tr., p. 2195-96).  The Court finds that DHW substantially

complied with Action Item 27H.

> **27J:  By November 1, 2001, DHW will notify counties, childcare
> providers, agency and Headstart staff, and schools about
> how to access training and technical assistance on the use of
> the pre-screening tool.  This training will also be available
> for inclusion in the Police Officer Standards and Training
> (POST) academy through an existing contract**.

**Findings of Fact and Conclusions of Law - 65**

DHW developed a pre-referral screening tool policy.  (Tr., p. 1543-44; Exhibit 2162).  The policy included an implementation protocol which identified how regions were to provide training.  (Tr., p. 1544; Exhibit 2162). As project manager for Jeff D, Decker Sanders had a team which was responsible to ensure field officers made training available and to provide it to community resources.  (Tr., p. 1707).  The training was not included in the POST academy; however, pre-screening tool training was given to probation officers and law enforcement in the community.  (Tr., p. 1711).  The Court finds that DHW substantially complied with Action Item 27J.

**28A:   Medicaid currently has a workgroup looking at financial incentives for providers to provide services in non-clinical settings, which may result in recommendations on this issue. After considering the results of the Medicaid recommendations for financial incentives, DHW may convene a workgroup which includes DJC, SDE, parent advocacy organizations, private providers, Medicaid and school districts to address barriers and incentives for private contractors to provide services in rural areas.  This workgroup would only be established if there were no recommendations made by the Medicaid workgroup.  If the DHW workgroup is established, the recommendations from the "School as Community Base" workgroup will also be considered in developing appropriate strategies.  Specific barriers that will be addressed include costs, transportation issues, lack of providers and geographic obstacles.**

DHW personnel have not seen any recommendations issued by a Medicaid workgroup on this matter. (Tr., p. 1627-28).  DHW is utilizing technology in an effort to address barrier of services in remote areas. (Tr., p. 2024).  Contracts with Kristina Harrington utilize technology for psychiatrists to provide consultation with family physicians. (Tr., p. 1519; Exhibits 2132 and 2133).  Medicaid allows transportation reimbursement under certain circumstances for PSR providers.  (Tr., p. 2172-74).  The Court finds that DHW substantially complied with Action Item 28A.

**28B:  As addressed in recommendation 18, mileage reimbursement issues are being explored as a possible incentive for the provision of these services**.

Medicaid allows transportation reimbursement under certain circumstances for PSR providers.  (Tr., p. 2172-74).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**28C:  By January 2002, DHW will determine the feasibility of using a traveling clinician to provide services to rural areas in each region and the feasibility of having masters level clinicians available in communities based on the CRW model.  This could be a contracted or staff position.  The action items under recommendation 17 addressing the expanded use of videoconferencing support this**

**Findings of Fact and Conclusions of Law - 67**

**recommendation, as videoconferencing may further expand provider's ability to serve children in home and school setting**.

DHW Region VI has four clinicians assigned to specific rural areas in the region.  (Tr., p. 1536).  DHW Region VI clinicians are available to travel to any part of the region to meet with a family either in a DHW outlying area office, in home or in school.  (Tr., p. 1536-37).  DHW Region II has clinicians based or travel to all the outlying DHW offices. (Tr., p. 1662-63). The Court finds that DHW substantially complied with Action Item 428.

**28D:  Continued expansion of the use of the Rehabilitation Option and the related action items under recommendation 18 also supports this recommendation**.

This is simply a statement referencing another recommendation. It does not require any specific action on DHW's part to meet compliance with this particular Action Item.

**28F:  DHW will communicate with the Medicaid workgroup working on this issue and expect that it will be explored when Legislative restrictions are lifted**.

DHW personnel have not seen any recommendations issued by a Medicaid workgroup on this matter.  (Tr., p. 1627-28).  DHW Rehabilitation Option Operations Team reviews interpretation of policy, make recommendations, hears what groups feel would be improvements in the PSR

program and make recommendations for those changes to Medicaid. (Tr., p. 1907-08).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**28G:   The feasibility of using a traveling clinician will be reviewed on an annual basis beginning May 2003**.

Region VI continues to provide this service.  (Tr., p. 1538).  Region II is continuing to use clinicians in outlying DHW offices. (Tr., p. 1663-64). The Court finds that DHW substantially complied with Action Item 28G.

**29D:   Local councils will be made aware of the efficacy of case management.  Local councils will be directed to inform families being served by the council that case management is available**.

Regional/Local Council Workgroup Report was a multi system approach  on how councils would work with families.  (Tr., p. 1528-29; Exhibit 2080).  A modification of the council staffing process was adopted in 2004.  (Tr., p. 1529; Exhibit 2160).  There is now a 2005 version of the business practice model.  (Tr., p. 1388-89; Exhibit 2060).  Wraparound teams now serve families rather than local council. (Tr., p. 1408-09; Exhibits 2160

and 2060).  The Court finds that DHW substantially complied with Action Item 29D.

> **29G:  DHW will provide training on the use and access of the EPSDT for children with SED**.

Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

> **29K:  Information on the use of care management will be part of the local charters, including the requirement that they inform participating families that this service may be available**.

The local council charter template requires local councils to conduct operations consistent with ICCMH standards and guidelines (Exhibit 2062). Wraparound teams now serve families rather than local council.  (Tr., p. 1408-09; Exhibits 2160 and 2060).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

> **30A:  By July 1, 2002, DHW and SDE, with input from other community agencies and families, will develop minimum standards for day treatment programs for each age level.**

**DHW and SDE will research and review models of age appropriate day treatment and will use the information to establish standards for these**.

A workgroup was formed to establish standards for day treatment. (Tr., p. 2036-37).  Day treatment standards were adopted by DHW.  (Tr., p. 1828; Exhibit 2088).  A larger follow-up workgroup created "New Directions for Student Support." (Tr., p. 2043; Exhibit 2385).  Day treatment standards are appropriate for all ages.  (Tr., p. 1628).  Service is to be individualized per child taking into account age. (Tr., p. 2055).  The Court finds that DHW substantially complied with Action Item 30A.

**30D:  This information would be used by DHW, DJC, and SDE to develop a decision unit and recommendations for expansion of age appropriate day treatment capacity**.

Previously a method for doing day treatment contracts resulted in a re-allocation of the budget from one region to another. (Tr., p. 1622).  DHW will be reviewing its day treatment services and contracts with school districts in cooperation with the SDE and Idaho Association of Counties this year to determine if changes need to be made.  (Tr., p. 1629).  The Court finds that DHW has not substantially complied with Action Item 30D.

**30F:  The standards were to be developed by July 1, but the parties agreed to allow the Department to develop consistent standards and definitions to be applied statewide and in**

> **conjunction with the School as a base workgroup
> recommendation, due October 1, 2002**.

A workgroup was formed to establish standards for day treatment.

(Tr., p. 2036-37).  Day treatment standards were adopted by DHW.  (Tr., p.

1828; Exhibit 2088).  A larger follow-up workgroup created "New

Directions for Student Support" (Tr., p. 2043; Exhibit 2385).  The Court

finds that DHW substantially complied with Action Item 30F.

> **30G:  The ICCMH will use this information to develop
> recommendations for the Governor's consideration in
> developing his budget decisions**.

DHW tracks the utilization of the day treatment which is included in

the Community Report.  (Tr., p. 1629).  Plaintiffs failed to present clear and

convincing evidence that the defendants failed to comply with any specific

and definite requirements of the defendants related to this Action Item, and

therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the

extent DHW had requirements under the Action Item, DHW substantially

complied with those requirements.

> **30H:  A workgroup will be established by April 1, 2003, to begin
> developing further recommendations for age appropriate
> day treatment programs**.

A workgroup was formed to establish standards for day treatment. (Tr., p. 2036-37).  Day treatment standards were adopted by DHW.  (Tr., p. 1828; Exhibit 2088).  A larger follow-up workgroup created "New Directions for Student Support." (Tr., p. 2043; Exhibit 2385).  Exhibit 2385 was presented to ICCMH in March of 2003. (Tr., p. 2046; Exhibit 2168). The Court finds that DHW substantially complied with Action Item 30H.

> **30I:   Age appropriate recommendations will be completed by October 1, 2003, and submitted to the ICCMH for their review and possible inclusion in the report to the Governor**.

Programs for multiple ages were discussed by the workgroup.  (Tr., p. 2054).  Service is to be individualized per child taking into account age. (Tr., p. 2055).  Exhibit 2385 was presented to ICCMH in March of 2003.  (Tr., p. 2046; Exhibit 2168).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had requirements under the Action Item, DHW substantially complied with those requirements.

> **31A:   By March 1, 2002, DHW will develop and implement a plan for providing on-going training and clinical support services for all therapeutic foster families serving children with SED**

> **through DWH.  Training will include methods to facilitate on-going family involvement with the therapeutic foster family during the child's placement**.

A Therapeutic Foster Care Workgroup developed recommendations regarding therapeutic foster care in Idaho.  (Tr., p. 1631; Exhibit 2391). Contained within the recommendations was information specifically relating to training and clinical support to therapeutic foster care parents while a child is in their home.  (Tr., p. 1631).  Exhibit 2172 reflects training requirements for therapeutic foster care families.  (Tr., p. 1969-70; Exhibit 2172).  DHW Region II received permission to place a child in a therapeutic foster care home while training of the provider was ongoing. (Tr., p. 1673). A plan for foster parent training has been developed and is being implemented by DHW.  (Tr., p. 2222-23). The Court finds that DHW substantially complied with Action Item 31A.

> **31B:  By March 1, 2002, and as an on-going activity, DHW, with the local councils and local businesses, will explore ways to create community incentives for therapeutic foster families. Community incentives may include such things as vouchers and discounts at local businesses**.

DHW staff has contacted local businesses asking them to provide gifts. (Tr., p. 1975-76).  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite

**Findings of Fact and Conclusions of Law - 74**

requirements of the defendants related to this Action Item, and therefore

Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW

had requirements under the Action Item, DHW substantially complied with

those requirements.

> **31F:  DJC will take advantage of contracts for available therapeutic foster care, when appropriate, by releasing youth in its custody to appropriate therapeutic foster care treatment when the youth and the community could best be served by such a placement**.

Plaintiffs failed to present clear and convincing evidence that the

defendants failed to comply with any specific and definite requirements of

the defendants related to this Action Item, and therefore Plaintiffs failed to

meet their burden of proof.

> **31G:  DJC will consult with DHW concerning development of therapeutic foster care for juvenile offenders with SED and concerning training of therapeutic foster care parents**.

DHW invited DJC to participate in a workgroup regarding therapeutic

foster care.  (Tr., p. 1976-77).  A system proposal was produced from the

workgroup which could be used by DJC.  (Tr., p. 1978; Exhibit 2174).  The

Court finds that DHW substantially complied with Action Item 31G.

> **31H:  Families will be advised of their and the Department's rights and responsibilities and potential benefits of this service**.

Contained within the Parental Rights and Responsibilities received at the time of application, the parent/guardian is informed of the right to an explanation of the full array of services offered within the Children's Mental Health program (Exhibit 2148).  The Parent's Guide references out-of- home placement services such as therapeutic foster care service (Exhibit 2146).  The Parent's Guide also sets forth the right to a full explanation of services that are offered within the Children's Mental Health program (Exhibit 2146).  Parents Guides are sent to parents who are referred to Idaho Federation of Families.  (Tr., p. 53940).  The Court finds that DHW substantially complied with Action Item 31H.

**31I:   By March 1, 2002, DHW will develop and implement strategies to increase the number of therapeutic foster homes that will include support, retention, recruitment, and reimbursement rate of all families.  This will include a study of other state's reimbursement rates**.

In 2001, DHW received an increase in foster care reimbursement rate. (Tr., p. 814-15; Exhibit 2350).  DHW received another increase in foster care reimbursement rate for 2004.  (Tr., p. 829-30; Exhibit 2285).  DHW requested a further increase in foster care reimbursement rates in 2005.  (Tr., p. 1992; Exhibit 2280).  Included in Exhibit 2280 are other states' reimbursement rates.  (Tr., p. 833).  The intent of increasing the

reimbursement rates was to help with recruitment and recognition of the

significance and importance of foster care. (Tr., p. 1993).  A flyer about

therapeutic foster care is included in recruitment packages that are sent to

people who express an interest in being a foster care family.  (Tr., p. 1968-

69; 1972).  However, DHW did not develop and implement a plan for

increasing the number of therapeutic foster homes.  The Court finds that

DHW has not substantially complied with Action Item 31I.

> **31J:  DHW, in consultation with DJC and families, will explore**
> **alternative ways of determining a family's financial**
> **obligations for a child in out-of-home care.  This will include**
> **exploring a possible rule change**.

DHW uses the Idaho Supreme Court Child Support Guidelines for

determining the families' financial obligations for reimbursement for out-of-

home care. (Tr., p. 1549).  DHW believes the current method of determining

financial obligations is equitable.  (Tr., p. 1549).  The Court finds that DHW

substantially complied with Action Item 31J.

> **31K:  A plan will be completed on how Defendants are going to**
> **develop a protocol to provide training and support to these**
> **families, to include strategies for increasing resources,**
> **recruitment and retention, due December 1, 2002**.

Therapeutic Foster Standards were created and adopted.  (Tr., p. 1829;

Exhibit 2092).  A Therapeutic Foster Care Workgroup developed

recommendations regarding therapeutic foster care in Idaho.  (Tr., p. 1631; Exhibit 2391).  Contained within the recommendations was information specifically relating to training and clinical support to therapeutic foster care parents while a child is in their home. (Tr., p. 1631).  DHW has received or requested increase in reimbursement rates for foster care three times. (Tr., p. 814-15; Exhibit 2350; Tr., p. 823-25; Exhibit 2275; Tr., p. 1992; Exhibit 2280).  The Court finds that DHW substantially complied with Action Item 31K.

**31L:   The plan will be included as an addendum to the Governor's report**.

Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**32A:   DHW will work with SDE to ensure that eligible families continue to have access to emergency assistance funding through the Community Resource Worker Program**.

DHW still has in place the Community Resource Worker Program (CRW).  (Tr., p. 1549-50).  In addition there is emergency assistance which provides funding for families in a crisis situation. (Tr., p. 1550).  The Court

finds that DHW substantially complied with Action Item 32A.

**32B:  DHW will develop a workgroup by January 1, 2003, with DJC, SDE, and parents to identify family supports and make recommendations as to a decision unit for those services**.

A workgroup was convened. (Tr., p. 1552-53).  A conclusion was reached that there was no need to recommend a decision unit for further family supports.  (Tr., p. 1553-54; Exhibit 2181).  The Court finds that DHW substantially complied with Action Item 32A.

**32D:  Training provided by parents (recommendations 1 and 41) will assist workers in understanding and identifying needed supports for families**.

Opportunities are provided for parents to participate in training.  (see Action Items under Recommendations 1 and 41 for specific facts)  Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**32E:  DHW will explore the use of community resources, including students in higher education programs in related fields, to provide family supports.  The authors of the Needs Assessment pointed out that the provision of these types of services may be provided by lay people or paraprofessionals**.

DHW Region VI has contracts with private providers to provide some of the services in Action Item 32E.  (Tr., p. 1538-40).  DHW Region II also has contracts for intensive family intervention services.  (Tr., p. 1664-65). Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.

**33A:  By December 1, 2001, DHW will develop statewide policies and standards related to authorization, access and reimbursement for respite care**.

DHW has developed a model for respite care services that provides authorization of a budget for a family to use to purchase the service, how they access the service and how reimbursement can be made for the provision of this service.  (Tr., pp. 2004-07; 2017).  DHW has developed respite care standards that incorporate best practice into the provision of this service throughout the state.  (Tr., p. 2007-08).  Exhibit 2100 is the respite care standards developed by DHW.  (Tr., p. 2007; Exhibit 2100).  DHW worked through an existing group headed by then First Lady of Idaho, Patricia Kempthorne, to contract with a national respite care center for a needs assessment.  (Tr., p. 1994-95).  Exhibit 2188 is the contract with the

ARCH Respite Care Center to conduct the needs assessment. (Tr., p. 1996-97; Exhibit 2188).  Exhibit 2113 shows that DHW discussed a delay in the work on this issue with Plaintiffs' counsel at the June 19, 2001 ICCMH meeting and Plaintiffs' counsel agreed to waiving the due date.  (Tr., p. 1995; Exhibit 2113).  Exhibit 2195 is the brochures developed by DHW for potential respite care providers and for families, providing information specific to each group on respite care services in the state.  (Tr., p. 2002-03; Exhibit 2195).  The Court finds that DHW substantially complied with Action Item 33A.

> **33B:   By May 1, 2002, DHW will identify areas of the state where gaps in respite care capacity exist and develop strategies for recruitment and retention to increase capacity**.

DHW contracted with a national respite care center, ARCH, for a statewide needs assessment for respite care in the state.  (Tr., p. 1994-95; 1997).  Exhibit 2113, p. 8, references a discussion held at the June 19, 2001, ICCMH meeting regarding the establishment of a respite care project by then First Lady of Idaho, Patricia Kempthorne.  (Tr., p. 1995; Exhibit 2113).  Exhibit 2188 is a copy of the contract with the ARCH Respite Care Center, which was the organization identified to conduct a respite care needs assessment in the state.  (Tr., p. 1996-97; Exhibit 2188).  Exhibit 2190 is the

needs assessment done by ARCH. (Tr., p. 1997-98; Exhibit 2190).  DHW

also undertook numerous activities to develop strategies for recruitment and

retention of respite care providers in the state.  (Tr., p. 2000-18).  Exhibit

2192 is an email distribution list from the computer of Ross Edmunds to the

members of the Idaho Respite Coalition, a group established by Mr. Edmunds

to work on the development of a respite care system in Idaho.  (Tr., p. 2000;

Exhibit 2192).  Exhibit 2195 includes two brochures developed by DHW and

a contractor to provide information to families about respite care services and

how to access these services, and to potential respite care providers.  (Tr., p.

2002-03; Exhibit 2195).  Exhibit 2063 is the ICCMH minutes from July 16,

2002, referencing a discussion by Ross Edmunds about the respite care

activities.  (Tr., p. 2003-05; Exhibit 2063).  Exhibit 2200 is a contract for a

"Train the Trainer" curriculum for training respite care providers.  (Tr., p.

2008; Exhibit 2200).  Exhibit 2201 is the agenda for the Region I respite care

training.  (Tr., p. 2009; Exhibit 2201).  Exhibit 2198 includes the sign in

sheets from each of the Regions for the respite care trainings. (Tr., p. 2009-0;

Exhibit 2198).  Exhibit 2431 is the manual developed through the DHW

contract for the respite care training.  (Tr, p 2010; Exhibit 2431).  Exhibit

2430 describes the agreement DHW has with the Idaho STARS program for

**Findings of Fact and Conclusions of Law - 82**

recruitment, retention and training activities for respite care providers.  (Tr.,

p. 2013-14; Exhibit 2430).  The Court finds that DHW substantially complied

with Action Item 33B.

> **33C:  DHW, in collaboration with families, will train respite care providers regarding appropriate strategies for working with children with SED on an on-going basis**.

Exhibit 2195 is a brochure that provides information on respite care

services to families who may be interested in utilizing these services.  The

brochure includes some information on what kind of information to give the

provider.  (Tr., p. 2002-03; 2018; Exhibit 2195).  Exhibit 2431 is the respite

care training manual.  There is information on what a parent might want to

consider in identifying a respite provider and the kinds of information they

may want to share with the provider to properly care for the particular child.

(Tr., p. 2018).  The Court finds that DHW substantially complied with

Action Item 33C.

> **33D:  See also recommendation 31, regarding Therapeutic Foster Care services**.

This is simply a statement referencing another recommendation. It

does not require any specific action on DHW's part to meet compliance with

this particular Action Item.

**Findings of Fact and Conclusions of Law - 83**

**33E:   On an on-going basis, DHW will develop strategies for identifying existing potential respite resources within the child's existing support system and community, such as extended family, neighbors and friends who might be willing to provide limited respite care when provided with appropriate training and sufficient supports**.

DHW has developed strategies for identifying potential respite resources within the child's existing support system and community. DHW's standards allow for the identification of natural supports to provide respite.  (Tr., p. 2015-17).  Exhibit 2100 is the DHW respite care standards that have been developed for best practice in the provision of this service. (Tr., p. 2007; Exhibit 2100).  DHW has identified a model that encourages the identification of natural supports to provide respite care.  (Tr., p. 2004; 2016).  The Court finds that DHW substantially complied with Action Item 33E.

**34A:   By May 1, 2002, the ICCMH will establish an early identification workgroup consisting of child care providers, pediatricians, infant toddler staff and a council member, school districts, parent advocacy, Head Start, and local council members to identify an age appropriate assessment tool and develop assessment methods that can aid in the accurate identification of young children with developing SED symptoms.  In addition, this workgroup should identify appropriate treatment methods and additional programming options for this age group**.

DHW staff helped establish a workgroup on early identification

issues.  The workgroup included various stakeholders, including child care providers, infant toddler staff, school staff, parents and a Headstart representative.  (Tr., p. 1755-56).  Exhibit 2202 is an agenda from one of the meetings of this workgroup and it includes a list of participants. (Tr., p. 1754-55; Exhibit 2202).  The workgroup developed a list of screening and assessment instruments that can be used to identify behavioral issues in young children.  (Tr., p. 1756-57).  Exhibit 2204 is the ICCMH minutes from September 17, 2002, which include a report by Mary Bostick from the SDE on the Early Identification workgroup.  (Tr., p. 1764; Exhibit 2204). The workgroup determined not to identify a single assessment instrument because it believed there is no single instrument that can be used for both ages birth to three years of age and for children five years and older.  The workgroup also felt it should be up to the professional who is doing the assessment to determine the most appropriate instrument to utilize for a particular child.  (Tr., p. 1757-58).  DHW's Infant Toddler program uses an instrument that measures social and emotional development in screening and assessing young children called Ages and Stages Questionnaire.  (Tr., p. 1758-60).  DHW contracts with the local Health Districts for screenings for children ages birth to three years of age.  Depending on the screening results,

the child may be referred to the Infant Toddler program for further

evaluation.  (Tr., p. 1760).  While the workgroup did not identify treatment

methods for this young group, the department utilizes a relationship-based

intervention that is recommended as most effective for this age range.  (Tr.,

p. 1762).  The Court finds that DHW substantially complied with Action

Item 34A.

> **34B:  By December 1, 2002, DHW will conduct outreach and offer
> training to community resource workers, child care
> providers, pediatricians and other health care providers
> throughout the state on the use of the tool to identify
> children who may need further mental health evaluation, a
> referral process for accessing DHW children's mental
> health services, and community treatment options for this
> age group.  The early identification workgroup should
> identify additional groups to be trained by DHW who may
> benefit from this training**.

DHW conducted a number of outreach and training activities on early

childhood emotional and behavioral development.  DHW held meetings on

developing an infant mental health system of care with teams from each of

the regions.  (Tr., p. 1766).  Exhibit 2204 is a binder of materials put

together for a training held when the regional teams were convened.  (Tr., p.

1766; Exhibit 2204).  DHW also participated in a conference to increase

knowledge about infant/toddler mental health.  (Tr., p. 1766).  The targeted

audience of the conference included DHW staff from both CMH and the

Infant/Toddler programs, Headstart staff, schools and parents.  (Tr., p.

1767).  DHW included a track on infant and early childhood mental health

issues in the CMH conference in 2004.  This included bringing in a

nationally recognized expert on infant mental health to present at the

conference.  (Tr., p. 1768-69).  Exhibit 2206 is the conference

announcement and agenda for the 2004 CMH conference that included the

presentation on infant mental health.   (Tr., p. 1768; Exhibit 2206).  DHW

participated in another conference that included a post-conference Saturday

track focused on early childhood providers and child care providers.  (Tr., p.

1770).  Exhibit 2207 is the conference announcement for the conference,

including information on the Saturday session.  (Tr., p. 1770).  The

conference included information for both parents and professionals working

with young children on mental illness and behavioral problems in children.

(Tr., p. 1771).  DHW also developed a booklet for care providers informing

them of what to look for related to early childhood mental illness and

warning signs, resources on these issues, and how to follow-up if they have

concerns.  It provides information on the Idaho Careline and the

Infant/Toddler program for referrals.  (Tr., p. 1772).  Exhibit 2208 is the

**Findings of Fact and Conclusions of Law - 87**

brochure for child care providers.  DHW also created a book for parents with

similar information as that provided in the brochure for the child care

providers.  (Tr., p. 1775).  A referral protocol has been developed within the

department, between the CMH and Infant/Toddler programs.  The protocol

delineates the two programs primary populations and how the programs will

coordinate together when appropriate.  (Tr., p. 1776).  Exhibit 2209 is the

referral protocol.  DHW has contracted through the Headstart collaboration

office with Idaho Public television for a program on social development,

called the Social Code.  The program also includes an hour-long CD that is

available for dissemination to Headstart and early childhood programs

statewide.   There is also a PowerPoint presentation for training providers

and a website available with the information on this particular program. (Tr.,

p. 1777).  DHW holds an Early Years Conference every few years that

focuses on children birth to age five.  At the 2004 conference, there was an

emphasis on social and emotional development through a specific track on

those subjects.  (Tr., p. 1778).  The Infant/Toddler program has also brought

in additional presenters on behavioral interventions for young children.  (Tr.,

p. 1778-79).  The Court finds that DHW substantially complied with Action

Item 34B.

**Findings of Fact and Conclusions of Law - 88**

**34E:   The Bonneville County local council is currently being used as a demonstration site to develop a model of identification and treatment of this population to expand this service**.

This is simply a statement referencing another recommendation. It does not require any specific action on DHW's part to meet compliance with this particular Action Item.

**35B:   By June 1, 2002, local councils will develop local protocols for serving youth transitioning out of the council's services. Local protocols will be modeled after the ICCMH standards**.

DHW aided the councils by drafting a protocol to be utilized by the Local Councils in transitioning youth out of the councils' services.  (Tr., p. 2022).  DHW presented the protocol to the ICCMH on April 16, 2002. (Tr., p. 2023).  Exhibit 2210 is the proposed protocol for youth transitioning out of Local Council services.  This was presented to the ICCMH on April 16, 2002 and approved by the ICCMH on May 21, 2002.  (Tr., p. 2022-23; Exhibit 2023).  The Court finds that DHW substantially complied with Action Item 35B.

**35E:   Minimum standards and best practice protocols were used to develop a protocol for the Local Councils, which was to be finalized by the ICCMH at the May 21, 2002 meeting**.

DHW developed minimum standards and best practice protocols for

the ICCMH related to transitioning youth from council services.  (Tr., p. 1815-16).  Exhibit 2210 is the protocol submitted to the ICCMH establishing the minimum standards and best practice for transitioning youth from council services.  (Tr., p. 1815; Exhibit 2210).  This was presented to the ICCMH on April 16, 2002 and approved by the ICCMH on May 21, 2002.  (Tr., p. 2022-23).  The Court finds that DHW substantially complied with Action Item 35E.

> **35F:  Review of the region II pilot on after care to develop recommendations to the ICCMH on an after-care protocol for the local councils when they are serving children coming out of DJC's care or other long-term placement**.

DHW reviewed the Region II pilot in developing a protocol to be utilized by CMH and the Juvenile Justice System, particularly DJC, for children coming in to or out of DJC.  (Tr., p. 1814-15).  DHW, in collaboration with DJC, developed a statewide protocol on how children coming out of DJC could be qualified for CMH services.  (Tr., pp. 1803-07).  Exhibit 2059 is the CMH/Juvenile Justice protocol that outlines how DHW and the various juvenile justice entities will work together in addressing children in the juvenile justice system with mental health needs as they transition out of the juvenile justice system.  (Tr., p. 1803-04; Exhibit 2059).

DHW also developed minimum standards and best practice protocols for the ICCMH related to transitioning youth from council services. (Tr., p. 1815-16). Exhibit 2210 is the protocol submitted to the ICCMH on March 1, 2002, establishing the minimum standards and best practice for transitioning youth from council services. (Tr., p. 1815; Exhibit 2210). The councils have also adopted a business practice model that identifies children transitioning from or to an out of home placement as their target population. (Tr., p. 1816-17). Exhibit 2060 is the Business Practice Model that identifies the Local Councils' target population as children either at risk for or returning from an out of home placement. The practice model outlines how services will be provided to these children. (Tr., p. 1816-17). The Court finds that DHW substantially complied with Action Item 35F.

**36A:  DHW will continue to monitor its utilization of and gaps in the service capacity of psychiatric beds for children with SED and will report this information to ICCMH annually**.

DHW provided information on the utilization of psychiatric beds for children in the state to the ICCMH. (Tr., p. 1557-58). This information is included in the ICCMH's Community Reports and can be accessed through the ICCMH website. (Tr., p. 1558). The Court finds that DHW substantially complied with Action Item 36A.

**Findings of Fact and Conclusions of Law - 91**

**37A:  DHW will continue to monitor its utilization of and gaps in the service capacity of residential treatment beds for children with SED and will report this information to the ICCMH annually**.

DHW monitors the use of residential treatment beds throughout the state and reports on this use to the ICCMH by providing the data on this service for inclusion in the ICCMH's annual Community Report.  (Tr., p. 1560).  Exhibit 2141 includes copies of the ICCMH Community Reports, which include data on the use of this service statewide.  (Exhibit 2141).  The Court finds that DHW substantially complied with Action Item 37A.

**37B: Review of this service will be done by March 1, 2003**.

DHW reviews its use of this service annually and provides the data on the use of residential treatment services statewide to the ICCMH annually for inclusion in the Community Report.  (Tr., p. 1560).  The Court finds that DHW substantially complied with Action Item 37B.

**38A:  DHW will continue to monitor its utilization of State Hospital South adolescent unit for children with SED and will report this information to the ICCMH annually**.

DHW staff monitor the utilization of the State Hospital South (SHS) adolescent unit.  (Tr., p. 1563).  DHW staff provide data on all inpatient hospitalizations to the ICCMH for inclusion in the Community Reports.

**Findings of Fact and Conclusions of Law - 92**

(Tr., p. 1560).  The Court finds that DHW substantially complied with

Action Item 38A.

**38B:  Staff at SHS will be fully informed of the implementation of this plan and any necessary changes for purposes of discharge planning**.

DHW staff have provided information to SHS staff on the

implementation plan and relevant actions.  (Tr., p. 1561-63).  DHW staff has

reviewed utilization of SHS beds and is aware that there were no waiting

lists for placement at the adolescent unit during the time reviewed.  (Tr.,

1563).  DHW determined after its review that there was no need for any

change with regard to the SHS adolescent unit.  (Tr., p. 1563).  The Court

finds that DHW substantially complied with Action Item 38B.

**38C:  This service will be monitored and tracked to determine if service gaps exist and how best to address them within the current system resources.  A review is to be done by March 1, 2003**.

DHW staff monitor the use of this service through communication

with regional offices and SHS staff.  (Tr., p. 1563).  DHW staff determined

after review of this service that no changes were required and no gaps were

found as there were no waiting lists for placement at SHS's adolescent unit

at the time of the review.  (Tr., p. 1563-64).  This service is reviewed

annually and data on SHS bed usage is included in the inpatient

hospitalization data provided to the ICCMH for the Community Report.

(Tr., p. 1560).  The Court finds that DHW substantially complied with

Action Item 38C.

> **39A:   By September 1, 2001, DHW will establish a workgroup
> bringing expertise from DD, education, DJC, CMH, families
> and state Human Resources to examine existing
> recruitment, training, and retention efforts across systems.
> The workgroup will include Eastern Washington and all
> Idaho universities and will focus on building on existing
> resources and identification of existing training and gaps in
> service.  The workgroup should also explore the use of
> technology (i.e., the Idaho CareLine and web pages) for
> disseminating information about educational, employment
> and training opportunities and resources**.

DHW staff convened a workgroup across systems, including

representative from the universities, DJC, CMH, Infant/Toddler and

education, to discuss workforce issues and program improvement.  (Tr., p.

2216).  DHW claimed there were challenges in engaging the universities at

that time due to the intervening event of welfare reform that impacted the

department's ability to sustain the existing contracts, and the natural

competition between universities for market share, students, contracts and

research projects.  (Tr., p. 2217-18).  Boise State University pulled their

contract because money was an issue.  (Tr., p. 2218).  Between 2001 and

2003, DHW continued to work with the universities individually, particularly EWU, and was able to get formal agreements with most of the state universities and colleges.   DHW was also able to get BSU back to the table in 2003.  (Tr., p. 2219).  DHW has contracted with EWU for two projects, one to extend an existing stipends programs for students willing to work for a public agency once they graduate, and the second to develop a foster parent training to be delivered by the universities.  (Tr., p. 2220).  DHW has developed several mechanisms to improve recruitment and retention of both foster parents and child welfare agency staff.  (Tr., p. 2226).  Exhibit 2214 is a list of university partners connected to foster parent training around the state.  (Tr., p. 2221-22).  DHW adopted a curriculum developed by the Child Welfare League of America consisting of a twenty-seven hour training to prepare new foster parents for foster parenting and licensure.  (Tr., p. 2222).  The foster care training model is called PRIDE.  It uses foster parents as co-trainers with department staff and university partners to provide multiple perspectives.  (Tr., p. 2223).  The CMH program utilizes foster care placements for children who need out of home placements, this may include therapeutic foster care as well.  All foster care homes must go through this training as the foundation and a requirement for

**Findings of Fact and Conclusions of Law - 95**

licensure.  (Tr., p. 2223).  Exhibit 2215 is a memorandum of agreement between the department and EWU.  This particular agreement represented a shift away from just a pure contract for services to an actual partnership where both parties were contributing financially.  (Tr., pp. 2224-25).  This agreement supports DHW's workforce development by allowing the department to impact the universities' curriculum on certain issues or topics in the social work degree programs.  The agreements with the universities also assist in the provision of the internal training academies provided to the child welfare staff, which includes the CMH program.  (Tr., p. 2226).  DHW also developed a separate contract with EWU for work under the Cooperative Agreement.  This includes an agreement for EWU to do the research component, assist with the CMH conference, developing a website and procuring two banks of e-learning content for foster parents.  (Tr., p. 2231).  Although DHW did not establish a workgroup at the time envisioned in the Action Item, DHW did work on the issue of workforce development and has since developed and entered into several contracts and agreements addressing the issues listed.  The Court finds that DHW substantially complied with Action Item 39A.

> **39C:  The progress on this recommendation will be reviewed again by September 1, 2002**.

DHW has continued to work on addressing workforce development in collaboration with its university partners.  (see Action Items 39A and 39B above).  DHW has continued developing agreements with the universities to address recruitment and retention issues.  (see Action Items 39A and 39B). DHW has established a significant partnership collaborative with EWU and the Casey Family Program, setting up a governance structure to jointly address issues of policy, training, evaluations and recruitment and retention issues. (Tr., p. 2241-45).  The Court finds that DHW substantially complied with Action Item 39C.

> **40A:** **By July 1, 2001, DHW will aid child psychiatrists to the Medicaid Quality Improvement Team or will determine the best way to get input from child psychiatrists regarding the barriers of recruitment and retention, especially in rural areas and their ideas for addressing shortages in manpower and expertise**.

DHW made the determination to convene a group of psychiatrists from throughout the state to discuss barriers related to the recruitment and retention of psychiatrists within the State of Idaho.  (Tr., p. 1564).  Exhibit 2220 is a copy of the meeting minutes from the psychiatrist workgroup referenced above.  (Tr., p. 1565).  The workgroup developed recommendations, which are included in the minutes.  (Tr., p. 1565).  The

Court finds that DHW substantially complied with Action Item 40A.

**40B:** **By October 1, 2001, DHW will develop a preliminary plan for increasing psychiatric services in the state including rural areas by utilizing the findings of the Medicaid Quality Improvement Team**.

DHW gathered input from child psychiatrists from around the state at a meeting held on December 14, 2001. (Tr., p. 1565). DHW determined a meeting of child psychiatrists was a better method of gathering input from these professionals than adding one to the Medicaid Quality Improvement Team; therefore, there were not findings of the Medicaid Quality Improvement Team. (Tr., p. 1564). DHW has taken other steps to increase the use of and access to child psychiatrists in the state. DHW staff have participated in a workgroup where they looked at the possibility of using video conferencing to expand psychiatric services in the state. (Tr., p. 2024). DHW has also developed and entered into a contract with St. Luke's for a pilot project in the Treasure Valley, known as MATCH, that uses video conferencing to provide training on mental health issues and provide a communication mechanism between child psychiatrists and primary care physicians. (Tr., p. 2024). The MATCH project provides access to a limited resource, that of child psychiatrists, for primary care physicians to

consult on mental health needs of their patients.  The primary care physician is matched with a child psychiatrist for consultation on a child's care.  (Tr., p. 2024).  Exhibit 2130 is the front page of the DHW contract with St. Luke's for the MATCH project.  (Tr., pp. 2024-25).  The MATCH project is aimed at providing greater access to child psychiatrists by allowing a child's medical home to remain with their primary physician but provide on-going and regular consultation and communication between the child psychiatrists and the physician to meet the mental health needs of the child without overburdening the limited child psychiatrists who cannot accept another full time patient.  (Tr., p. 2027).  A psychiatrist was not added as a member of the Medicaid Quality Improvement Team; therefore, there were no findings to use to create a plan.  However, DHW has taken other actions to increase access to child psychiatric services in the state.  The Court finds that DHW substantially complied with Action Item 40B.

**40C:  See also recommendation 17, which addresses expanding the use of videoconferencing as a possible method to enhance utilization of psychiatric services**.

This is simply a statement referencing another recommendation. It does not require any specific action by DHW to comply with this particular Action Item.

**40D:  See also recommendation 18, which addresses the expanded use of the Rehabilitation Option, and recommendation 28, which addresses the provision of services in a non-clinic setting**.

This is simply a statement referencing other recommendations. It does not require any specific action by DHW to comply with this particular Action Item.

**40F:  The recommendations from the committee continue to be looked at by various workgroups that are better suited to addressing each**.

DHW continues to look at the recommendations of the child psychiatrist workgroup for ideas for increasing access to these professionals throughout the state.  DHW has utilized video conferencing to provide statewide training on CMH issues.  (Tr., p. 2027-28).  DHW, through a contract, provides a monthly telephone conference call at which a child psychiatrist is available to answer questions from primary care physicians.  (Tr., p. 2028).  The MATCH pilot project is also intended to increase access to child psychiatry resources.  (Tr., p. 2027).  This is simply a statement referencing other recommendations. It does not require any specific action by DHW to comply with this particular Action Item.

**41A:  Local councils will be encouraged to work with parent representatives to develop parent to parent supports and**

**services in the local area**.

DHW has taken significant actions to develop parent to parent support services through its contract with the Idaho Federation of Families.  (see Action Item 41I). Plaintiffs failed to present clear and convincing evidence that the defendants failed to comply with any specific and definite requirements of the defendants related to this Action Item, and therefore Plaintiffs failed to meet their burden of proof.  Moreover, to the extent DHW had requirements under the Action Item, DHW substantially complied with those requirements.

**41B:   By December 1, 2001, DHW and DJC will identify potential ongoing funding that can be used to reimburse parent run training or services**.

DHW has identified funding to provide both parent run training and for family support services.  A contract with the Idaho Federation of Families, an advocacy organization, provides training, education and advocacy services to families with children with mental health needs.  DHW has identified funding through its federal Mental Health Block grant and the Cooperative Agreement to contract with the Federation.  (Tr., p. 2057-58; 535-36).  DHW also provides family support services through its general funds. (Tr., p. 2058).  DHW has a contract with the Federation for advocacy

services and it has multiple contracts in the regions for family support services. (Tr., p. 2058). Family support services include services or supports that may assist a family in meeting the needs of their children, such as transportation or money for gasoline to travel to appointments. (Tr., p. 2056-57). Exhibit 2024 is a grant agreement with the Federation for 2000 through 2001. (Tr., p. 2059-60). Exhibit 2433 is a contract with the Federation for the period of 2003 through 2004. (Tr. p. 2060). Exhibit 2432 is an amendment to the Federation contract to extend the contract and provide additional funding. (Tr., p. 2061). The Court finds that DHW substantially complied with Action Item 41B.

> **41D: During 2001, DHW will work with the Idaho Federation of Families and other parent organizations to identify types of services and supports that could be provided by families and the types of supports and incentives that could be used to tap this resource**.

DHW has contracted with the Idaho Federation of Families to provide support services to families with children with mental health needs. The Federation provides numerous services to families throughout the state, including: parent to parent support groups, sibling support groups, advocacy services to individual families and on behalf of all families, information and referral services, as well as providing reimbursement to families

**Findings of Fact and Conclusions of Law - 102**

participating in the system of care by attending meetings or trainings.  (Tr.,
p. 2058-59; 2062-63; 537; 568-69.  Exhibit 2435 and its subparts 1-4 are the
Federation reports on the activities of the organization performed pursuant to
the terms of the contract.  (Tr., p. 532-33).  Federation staff includes parents
of children with mental health needs.  (Tr., p. 569-70).  These parents are
providing advocacy and educational services to other families with children
with mental health needs.  Plaintiffs' witnesses, Barbara Hill and Angela
Hicks work with the Federation to provide services to these families.  The
Court finds that DHW substantially complied with Action Item 41D.

> **41E:  By September 1, 2001, and annually thereafter, DHW, SDE,
> County Probation, School Districts and DJC will identify
> methods for including parents in training opportunities for
> staff and agencies**.

DHW has provided trainings that have been open to other agencies
and to families and parents to attend.  (Tr., p. 1569).  DHW has also paid for
parents to attend trainings and conferences, both state conferences and
national level conferences on CMH.  (Exhibits 2016 and 2019).  DHW has
also provided reimbursements through the Federation of Families to families
attending trainings and conferences.  (Exhibit 2436 and its subparts 1-7).
DHW paid for Plaintiffs' witness Diane Sheirbon and her son Daniel to

attend the National System of Care SAMHSA conference in Orlando,

Florida in July of 2006.  (Tr., p 223).  The Court finds that DHW

substantially complied with Action Item 41E.

> **41F:  DHW and DJC will seek funding to continue to contract with a parent advocacy organization for the family participation survey**.

DHW has identified funding to contract with a parent advocacy

organization.  A contract with the Idaho Federation of Families, provides

training, education and advocacy services to families with children with

mental health needs.  DHW has identified funding through its federal Mental

Health Block grant and the Cooperative Agreement to contract with the

Federation.  (Tr., p. 2057-58).  DHW has developed a family satisfaction

survey that it uses to measure the satisfaction of the families receiving

services through the agency.  (Tr., p. 1894-95).  DHW adopted a policy that

implements the use of a family satisfaction survey within the CMH program.

(Tr., p. 1893).  Exhibit 2230 is the FACs Policy Memorandum on the use of

family satisfaction surveys.  (Tr., p. 1893).  Exhibit 2231 is a copy of the

original family satisfaction survey utilized by DHW. (Tr., p. 1893-94).

DHW has tracked the results of the surveys and has provided data from

reports run from the system tracking the surveys in the Community Reports

of the ICCMH. (Tr., p. 1894).  DHW has adopted a new family satisfaction

survey that was developed by the Substance Abuse and Mental Health

Services Administration (SAMHSA).  (Tr., p. 1898).  Exhibit 2232 is a copy

of the new family satisfaction survey. (Tr., pp. 1897-98).  The Court finds

that DHW substantially complied with Action Item 41F.

     **41H:  See also, recommendations 1 and 32**.

This is simply a statement referencing another recommendation. It

does not require any specific action by DHW to comply with this particular

Action Item.

     **41I:   Family Advocacy Organization to begin developing parent
           to parent supports and services and track parent run
           services**.

DHW has contracted with the Idaho Federation of Families to provide

support services to families with children with mental health needs.  The

Federation provides numerous services to families throughout the state,

including: parent to parent support groups, sibling support groups, advocacy

services to individual families and on behalf of all families, information and

referral services, as well as providing reimbursement to families

participating in the system of care by attending meetings or trainings.  (Tr.,

p. 2062-63).  DHW has amended the contract with the Federation to have

**Findings of Fact and Conclusions of Law - 105**

that organization act as the fiscal agent for providing reimbursement and

stipends to family members participating in councils, trainings or

conferences.  DHW provides the funding to reimburse the families and

contracts with the Federation to provide this payment function.  (Tr., p.

2059).  Exhibit 2435 and its subparts 1-4 are the Federation reports on the

activities of the organization performed pursuant to the terms of the contract.

The Federation is a member of the ICCMH and provides input and feedback

to the council in their representation of families with children with mental

health needs.  (Tr., p. 537; 549).  As a member of the ICCMH, the

Federation participates in the Report to the Governor and the Community

Report Card, providing information on their services and supports in those

documents.  (Tr., p. 558; Exhibits 2078 and 2141).  The Court finds that

DHW substantially complied with Action Item 41I.

**41J:  Plan to provide any parent applying for services a brochure
on advocacy resources and to get consent to provide their
name and contact information to the advocacy
organizations they identify**.

Exhibit 2148 is a policy DHW adopted instructing staff as to what

materials and information are to be provided to a family when they apply for

services through the CMH program.  (Tr., p. 2068).  DHW provides families

**Findings of Fact and Conclusions of Law - 106**

applying for services a document with a list of advocacy organizations and

their contact information.  (Tr., p. 2068-69).  Exhibit 2148 also includes a

copy of the list of advocacy organizations that is provided to families

applying for CMH services.  DHW also provides a consent form to the

families.  If the family signs the consent form, their contact information is

sent to the Federation so that the family may be contacted by the Federation.

(Tr., p. 2069-70; 539).  Exhibit 2030 is the consent form to provide contact

information to the Federation.  (Tr., p. 2069).  Exhibit 2437 and its subparts

1-4 are copies of consent forms sent to the Federation providing contact and

referral information.  The Court finds that DHW substantially complied with

Action Item 41J.

> **41K:  Information from DHW family satisfaction surveys will be
> included in the data report due in October 2002 and will be
> used in the continuous quality assurance process as well**.

DHW developed a family satisfaction survey that it used to measure

the satisfaction of the families receiving services through the agency.  (Tr.,

p.1898).  DHW adopted a policy that implements the use of a family

satisfaction survey within the CMH program.  (Tr., p. 1893).  Exhibit 2230

is the FACs Policy Memorandum on the use of family satisfaction surveys.

(Tr., p. 1893).  Exhibit 2231 is a copy of the original family satisfaction

survey utilized by DHW. (Tr., p. 1893-94).  DHW has tracked the results of

the surveys and has provided data from reports run from the system tracking

the surveys in the Community Reports of the ICCMH. (Tr., p. 1894).  DHW

has adopted a new family satisfaction survey that was developed by the

Substance Abuse and Mental Health Services Administration (SAMHSA).

(Tr., p. 18980.  Exhibit 2232 is a copy of the new family satisfaction survey.

(Tr., pp. 1897-98).  DHW will also be tracking the results of the new

satisfaction survey through a national database maintained by the federal

government.  (Tr., p. 1898).  Information on DHW's family satisfaction

survey results is included in the ICCMH's Community Reports.  (Tr., p.

2064).  DHW has developed and implemented a Continuous Quality

Improvement (CQI) process that gathers information and uses the

information gathered to improve the quality of the services provided.  (Tr.,

p. 1888).  Exhibit 2236 is the DHW Continuous Quality Improvement

process.  (Tr., p. 1888).  The CQI process details how the program is to use

different sources of information to monitor and identify ways of improving

the quality of the program, including numerous internal review systems.

(Tr., p. 1889).  The Court finds that DHW substantially complied with

Action Item 41K.

**Findings of Fact and Conclusions of Law - 108**

**42A:  See recommendation 15 standardization of Medicaid reimbursed services**.

This is simply a statement referencing another recommendation. It does not require any specific action by DHW to comply with this particular Action Item.

**42B:  See recommendations 16 – review of access issues**.

This is simply a statement referencing another recommendation. It does not require any specific action by DHW to comply with this particular Action Item.

**42C:  See recommendation 18 – review for expansion of the use of the Rehabilitation Option**.

This is simply a statement referencing another recommendation. It does not require any specific action by DHW to comply with this particular Action Item.

**42D:  Increase tracking of outcomes/targets established by the ICCMH and local councils with data provided by DHW, DJC, and SDE**.

DHW established a baseline of the core services that includes the number of children served by each of the core services on a statewide basis. (Tr., p. 1949).  DHW has provided its baseline data to the ICCMH annually to be included in the Community Reports. (Tr., p. 1949).  Exhibit 2141 is a

copy of each of the ICCMH Community Reports, which include DHW's

data.  Exhibits 1108 and 2362 are charts created by DHW providing data on

the provision of each core service, including the number of children served,

the source of the funding, and the amount of funding, both by region and

statewide.  DHW tracks outcomes for its own services through regular

reviews of a child's CAFAS scores and tracking of the responses to the

family satisfaction surveys. (Tr., pp. 1894-97).  The Court finds that DHW

substantially complied with Action Item 42D.

> **43A:  By July 1, 2001, DHW will contract with a nationally
> recognized consultant to provide technical assistance to the
> Idaho Council on Children's Mental Health as they develop
> accountability and outcome standards**.

DHW amended the contract it had with the Human Services

Collaborative, the organization that conducted the 1999 Needs Assessment,

to extend the contract to consult with Cliff Davis on the ICCMH.  (Tr., p.

1571).  Exhibit 2065 is a summary by Chuck Halligan on information from

the technical assistance report done by Cliff Davis related to this contract

extension.  Exhibit 2075 is a copy of the technical assistance report prepared

by Cliff Davis.  Exhibit 2102 is a copy of the contract with Human Services

Collaborative consultant, Cliff Davis.  The Court finds that DHW

substantially complied with Action Item 43A.

**43C:  By November 1, 2002, and annually thereafter, the ICCMH will submit a report of progress toward implementing the Idaho Children's Mental Health Services Act and meeting the plan adopted by the federal court**.

DHW aided in the development of the ICCMH's Report to the Governor and the Community Reports.  (Tr., p. 1712).  Exhibit 2078 includes copies of the ICCMH annual Reports to the Governor from 2002 through 2005.  Exhibit 2141 includes copies of the ICCMH annual Community Reports.  After reviewing those documents, the Court finds that DHW substantially complied with Action Item 43C.

**43D:  By January 1, 2002, and annually thereafter, DHW through their legal counsel will submit a report that will include information regarding evaluating the current progress of the plan, barriers, resource needs, and service gaps and a corrective action plan**.

The Court set a reporting schedule for the Defendants in this case from 2001 through April 2003.  (see Docket No. 367).  DHW filed progress reports with the Court according to that schedule.  (see Docket Nos. 361, 369, 377, 388, 393, 398, 402, 410).  The ICCMH has also submitted annual Reports to the Governor and Community Reports outlining the progress of the developing system of care.  (Exhibits 2078 and 2141).  Plaintiffs'

counsel regularly attends the ICCMH and other system meetings.  (Exhibits
2018, 2034, 2044, 2063, 2070, 2081, 2082, 2103, 2113, 2119, 2159, 2160,
2166, 2204, 2211, 2257, 2258, 2378).  The Court finds that DHW
substantially complied with Action Item 43D.

> **43E:   At all stages of the implementation of the action plan, the
> court and counsel will receive documentation where
> available of the developed protocols, guidelines, agreements,
> targets, reports, and any other material that will aid in the
> court's determination of the efforts being made in this
> process**.

This is simply a statement referencing other recommendations.
It does not require any specific action by DHW to comply with this
particular Action Item.

> **43F:   See also recommendations addressing development of
> accountability and outcome standards to be used by regions
> and the local councils in tracking**.

This is simply a statement referencing other recommendations. It does
not require any specific action by DHW to comply with this particular
Action Item.

> **44B:   Within the first year of operation, local councils and
> agencies will identify the current level of services and their
> accessibility.  The local councils and agencies will develop
> their numeric targets or outcomes for services in their area,
> and determine priorities based on needs and gaps identified
> regionally**.

DHW developed a baseline of its core services by utilizing data from its various information systems.  (Tr., p. 1945-46; 1949).  DHW regions each have developed service delivery goals, or targets, for the core services that they have identified for efforts in increasing capacity.  (Tr., pp. 1951-52).  Exhibit 2077 is a copy of the regional service delivery goals.  (Tr., p. 1951).  Based upon the record before it, the Court finds that DHW substantially complied with Action Item 44B.

> **44C:  Policy academies will assist local councils in developing appropriate targets**.

This is simply a statement referencing another recommendation. It does not require any specific action on DHW's part to meet compliance with this particular Action Item.

> **44D:  By December 1, 2002, DHW will analyze current levels of services in each region using standardized service definitions and common tracking mechanisms to develop a baseline of current capacity and a method for measuring progress over time with numeric targets or outcomes**.

DHW established standardized service definitions for each of the core services that are used to track and measure the service utilization.  (Tr., p. 1951).  DHW developed a baseline of its core services by utilizing data from its various information systems.  (Tr., p. 1945-46; 1949).  DHW regions

**Findings of Fact and Conclusions of Law - 113**

each have developed service delivery goals, or targets, for the core services

that they have identified for efforts in increasing capacity.  (Tr., pp. 1951-

52).  Exhibit 2077 is a copy of the regional service delivery goals.  (Tr., p.

1951).  Exhibits 1108 and 2362 are charts created by DHW providing data

on the provision of each core service, including the number of children

served, the source of the funding, and the amount of funding, both by region

and statewide.   The baseline data is the data for fiscal year 2001.  Progress

can be measured by comparing each subsequent fiscal year data to the

baseline year of FY 2001.  (Tr., p. 1945-46).  The Court finds that DHW

substantially complied with Action Item 44D.

> **44E:  Baselines will help with sizing capacity of services per
> regional population and then set outcomes related to those
> findings**.

DHW established standardized service definitions for each of the core

services that are used to track and measure the service utilization.  (Tr., p.

1951).  DHW developed a baseline of its core services by utilizing data from

its various information systems.  (Tr., p. 1945-46; 1949).  DHW regions

each have developed service delivery goals, or targets, for the core services

that they have identified for efforts in increasing capacity.  (Tr., pp. 1951-

52).  Exhibit 2077 is a copy of the regional service delivery goals.  (Tr., p.

1951).  Exhibits 1108 and 2362 are charts created by DHW providing data

on the provision of each core service, including the number of children

served, the source of the funding, and the amount of funding, both by region

and statewide.  The baseline data is the data for fiscal year 2001.  Progress

can be measured by comparing each subsequent fiscal year data to the

baseline year of FY 2001.  (Tr., p. 1945-46).  The Court finds that DHW

substantially complied with Action Item 44E.

> **44F:  By October 1, 2001, DHW will establish a method for
> tracking time spent by service.  Information gathered from
> the tracking will be used to establish a baseline of current
> staff capacity per service and outcome measurements**.

DHW was awarded a SAMHSA grant, but was not able to utilize the

grant to develop a method for tracking staff time.  (Tr., p. 1586).  It was

determined that it would be more cost efficient and effective to identify a

method for tracking staff time for both the CMH and Child Welfare

programs, rather than only the CMH program, given the significant cost of

conducting such a study and developing recommendations.  (Tr., p. 1586-

87).  DHW has been able to identify funding to contract for a time study for

both programs and currently have a contract working on this issue.  (Tr., p.

1587).  Exhibit 2362, 2001-05 data and Exhibit 1108, are charts created by

DHW providing data on the provision of each core service, including the number of children served, the source of the funding, and the amount of funding, both by region and statewide.  The baseline data is the data for fiscal year 2001.  Progress can be measured by comparing each subsequent fiscal year data to the baseline year of FY 2001.  (Tr., p. 1945-46).  The Court finds that DHW substantially complied with Action Item 44F.

> **44G:  The ICCMH will submit a report on the system's progress, identify barriers and make recommendations in a report to the Governor by November 1, 2002**.

DHW aided in the development of the ICCMH's Report to the Governor and the Community Reports.  (Tr., p. 1712).  Exhibit 2078 includes copies of the ICCMH annual Reports to the Governor from 2002 through 2005.  Exhibit 2141 includes copies of the ICCMH annual Community Reports.  The Court finds that DHW substantially complied with Action Item 44G.

> **44H:  Family satisfaction surveys have been developed by the three main child-serving agencies.  These surveys will be reviewed and improved based on input from the stakeholders as needed**.

DHW developed a family satisfaction survey that it used to measure the satisfaction of the families receiving services through the agency.  (Tr.,

p.1898).  Exhibit 2231 is a copy of the original family satisfaction survey

utilized by DHW. (Tr., p. 1893-94).  DHW has adopted a new family

satisfaction survey that was developed by the Substance Abuse and Mental

Health Services Administration (SAMHSA).  (Tr., p. 1898).  Exhibit 2232 is

a copy of the new family satisfaction survey. (Tr., pp. 1897-98).  DHW will

also be tracking the results of the new satisfaction survey through a national

database maintained by the federal government.  (Tr., p. 1898).  The new

survey was developed by a group at the national level, including the

National Federation of Families.  (Tr., p. 1898).  The Court finds that DHW

substantially complied with Action Item 44H.

> **45A:  By November 1, 2001, the ICCMH will research other
> states' indicators and secure technical assistance, if needed,
> to identify key child and family indicators to be included in
> the Community Report Card**.

DHW secured technical assistance in assisting the ICCMH with its

Community Report through its contract with Cliff Davis.  (Tr., p. 1572).

DHW, through the contract with Mr. Davis and research, identified key

indicators for the department's services.  9Tr., p. 1574).  DHW has included

service utilization data in the ICCMH's Community Reports. (Tr., p. 1575).

Exhibit 2141 are copies of the annual ICCMH Community Reports.  The

**Findings of Fact and Conclusions of Law - 117**

Court finds that DHW substantially complied with Action Item 45A.

**45B:  By November 1, 2001, each participating entity on the ICCMH will identify indicators used within their current system to be used to establish the key indicators from DHW, DJC, and SDE to be measured in the Community Report Card, which will include information from the Family Satisfaction Surveys**.

DHW secured technical assistance in assisting the ICCMH with its Community Report through its contract with Cliff Davis.  (Tr., p. 1572). DHW, through the contract with Mr. Davis and research, identified key indicators for the department's services.  (Tr., p. 1574).  DHW has included service utilization data in the ICCMH's Community Reports.  (Tr., p. 1575). Exhibit 2141 are copies of the annual ICCMH Community Reports.  DHW has also included information from its Family Satisfaction Surveys as a key indicator for monitoring its services.  (Tr., p. 1574).  The Court finds that DHW substantially complied with Action Item 45B.

**45D:  By December 1, 2002, and annually thereafter, a Community Report Card that includes children's mental health indicators will be published and disseminated statewide**.

DHW has assisted the ICCMH in producing its Community Report by authoring gathering the information from the various agencies and drafting the report.  (Tr., pp. 1574-75).  DHW has published the Community Reports

**Findings of Fact and Conclusions of Law - 118**

on the department and ICCMH websites, disseminated to the State Mental
Health Planning Council and provided copies via email to its regional
program managers.  (Tr., p. 1575).  DHW has included its service utilization
data in the ICCMH's Community Reports. (Tr., p. 1575).  Exhibit 2141 is
copies of the annual ICCMH Community Reports.  The Court finds that
DHW substantially complied with Action Item 45D.

> **45E:  The Community Report Card will include indicators as to
> the expansion of the six core services**.

DHW data on its provision of the core services is provided to the
ICCMH and included in the ICCMH's annual Community Report.  (Tr., p.
1861).  DHW included its baseline data in the ICCMH's Community Report
along with each successive year to provide data on the changes in the core
service capacity.  (Tr., p. 1948-49).  Exhibit 2141 is a copy of the
Community Reports that have been issued by the ICCMH.  (Tr., p. 1949).
The Court finds that DHW substantially complied with Action Item 45E.

> **48B:  It is anticipated that DHW and DJC will develop a specific
> plan for enhancing the communications with the court
> system, including who the information will go to, who will
> provide the information and how to monitor that system's
> use of these resources.  The plan will be completed by
> October 1, 2002**.

DHW staff provided a presentation on the CMH system and services

at the 2001 Magistrate Judges' Conference.  (Tr., p. 1791).  DHW staff

attends meetings of the Idaho Association of County Juvenile Justice

Administrators (IACJJA) on an on-going basis to provide this group

information on DHW CMH services, Local Council information and

information on resources, including assessments.  (Tr., p. 1791-92; 1420).

Exhibit 2375 is the minutes from the IACJJA meetings that are attended by

DHW staff.  (Tr., p. 1800).  DHW has established a workgroup, the Juvenile

Justice Children's Mental Health Collaborative to provide regular dialogue

between the CMH program and members of the JJ system in addressing the

mental health needs of children who are in both systems.  (Tr., p. 1792;

1420; 1422).  DHW staff meet with county level JJ staff to provide

information and talk about issues related to children with mental health

needs in their system.  (Tr., p. 1792).  DHW reviewed the Region II pilot in

developing a protocol to be utilized by CMH and the Juvenile Justice

system, particularly DJC, for children coming in to or out of DJC.  (Tr., p.

1814-15).  DHW, in collaboration with DJC, developed a statewide protocol

on how children coming out of DJC could be qualified for CMH services.

(Tr., pp. 1803-07).  Exhibit 2059 is the CMH/Juvenile Justice protocol that

outlines how DHW and the various juvenile justice entities will work

together in addressing children in the juvenile justice system with mental

health needs as they transition out of the juvenile justice system.  (Tr., p.

1803-04).  Exhibit 2386 is a presentation given by Ross Edmunds to the

Magistrate Judges conference in 2001.  (Tr., p. 1794-95).  Exhibit 2364 is a

proposal for a presentation that was to be given to the IAJJA.  (Tr., p. 1796-

97).  DHW regions have identified a regional liaison to work with local

county probation and the JJ system.  These liaisons communicate with the JJ

system, receive referrals from the JJ system, attend meetings, complete

assessments and may respond to the local juvenile detention centers.  (Tr., p.

1798-99).  DHW staff also attends meetings of the JJ Magistrate Advisory

meetings on behalf of the department to provide information to the

magistrate judges on how to access CMH services and to discuss their

concerns.  (Tr., p. 1423).  DHW staff attended the Magistrate's Institute to

discuss the implementation of a new juvenile statute related to CMH.  (Tr.,

p. 1423-24).  DHW staff was also involved in the drafting and passage of

legislation containing amendments to both the Juvenile Corrections and

CMH Services Acts and meetings subsequent to passage to work on

implementation of the new amendments.  (Tr., pp. 1424-26).  The Court

finds that DHW substantially complied with Action Item 48 B.

**Findings of Fact and Conclusions of Law - 121**

**49A:  DHW will continue to use CAFAS as a way to review effectiveness of services**.

DHW tracks outcomes for its own services through regular reviews of a child's CAFAS scores and tracking of the responses to the family satisfaction surveys. (Tr., pp. 1894-97).  The CAFAS scores are an outcome instrument utilized by DHW to review the effectiveness of the services a child is receiving.  Comparing CAFAS scores over a period of time allows the department to monitor the functional impairment of a child and whether there are improvements with the provided services.  (Tr., p. 1896-97).  The Court finds that DHW substantially complied with Action Item 49A.

**49B:  By May 1, 2002, DHW will provide training to management and supervisory staff regarding use of data and outcomes to manage programs.  Although the training, available through Health and Human Services, is child welfare specific, DHW will open the training to all partner agencies**.

DHW provided training to its staff on the use of data to manage and improve the programs.  (Tr., p. 1878).  Exhibit 2233 is the agenda for the information management training provided by the department in early 2002.  (Tr., p. 1877-78).  Based upon its review of the record and trial exhibits, the Court finds that DHW substantially complied with Action Item 49B.

**49C:  Utilization Management's information system will track funds expended by DHW for children's mental health**

**services**.

Utilization Management was an initiative from the legislature for prior authorization and monitoring and management of the services the department provides; however, the legislature determined not to use this initiative.  (Tr., p. 1505-06).  DHW has improved its information management system and its reporting capabilities so that it can now track funding for CMH services.  (Tr., pp. 1850-53).  Previously, the information systems could produce reports, but there was not a great deal of data actually tracked and there was not a great deal of confidence in the accuracy of the data produced.  (Tr., p. 1847-48).  DHW CMH staff has worked with the Information Technology staff to develop reports from the three information systems (FOCUS, IDEA, and the service evaluation database) that can be done more quickly and have been tested to assure accuracy of the data being reported.  (Tr., pp. 1850-53).  DHW CMH program can now track funds expended by the department on CMH services by major funding source, such as general funds or Medicaid.  (Tr., p. 1866-67; Exhibits 2362 and 1108).  DHW can also track service provision by the number of children served in each core service by region and statewide.  (Tr., p. 1866-67; Exhibits 2362 and 1108).  Exhibit 2362, 2001-05 data and Exhibit 1108, are

**Findings of Fact and Conclusions of Law - 123**

charts created by DHW providing data on the provision of each core service,

including the number of children served, the source of the funding, and the

amount of funding, both by region and statewide.  The baseline data is the

data for fiscal year 2001.  Progress can be measured by comparing each

subsequent fiscal year data to the baseline year of FY 2001.  (Tr., p. 1945-

46).  DHW was not able to use Utilization Management to track CMH

funding for services, but it has improved tracking through the development

of data reports from the three information systems and can now track funds

expended for CMH services.  The Court finds that DHW substantially

complied with Action Item 49C.

> **49D:  DHW will monitor exactly what services are provided or
> purchased, unit and per-child costs, demographic and
> functional information about children served, and outcomes
> achieved from both functional and satisfaction perspectives**.

Utilization Management was an initiative from the legislature for prior

authorization and monitoring and management of the services the

department provides; however, the legislature determined to not use this

initiative.  (Tr., p. 1505-06).  DHW has improved its information

management system and its reporting capabilities so that it can now track

funding for CMH services.  (Tr., pp. 1850-53).  Previously, the information

systems could produce reports, but there was not a great deal of data actually

tracked and there was not a great deal of confidence in the accuracy of the

data produced.  (Tr., p. 1847-48).  DHW CMH staff has worked with the

Information Technology staff to develop reports from the three information

systems (FOCUS, IDEA, and the service evaluation database) that can be

done more quickly and have been tested to assure accuracy of the data being

reported.  (Tr., p. 1850-53).  DHW CMH program can now track funds

expended by the department on CMH services by major funding source,

such as general funds or Medicaid.  (Tr., p. 1866-67; Exhibits 1108 and

2362).  DHW can also track service provision by the number of children

served in each core service by region and statewide.  (Tr., p. 1866-67;

Exhibits 1108 and 2362).  Exhibits 1108 and 2362 are charts created by

DHW providing data on the provision of each core service, including the

number of children served, the source of the funding, and the amount of

funding, both by region and statewide.  The baseline data is the data for

fiscal year 2001.  Progress can be measured by comparing each subsequent

fiscal year data to the baseline year of FY 2001.  (Tr., p. 1945-46).  DHW

tracks outcomes for its own services through regular reviews of a child's

CAFAS scores and tracking of the responses to the family satisfaction

**Findings of Fact and Conclusions of Law - 125**

surveys.  (Tr., pp. 1894-97).  The CAFAS scores are an outcome instrument

utilized by DHW to review the effectiveness of the services a child is

receiving.  Comparing CAFAS scores over a period of time allows the

department to monitor the functional impairment of a child and whether

there are improvements with the provided services.  (Tr., p. 1896-97).  The

Court finds that DHW substantially complied with Action Item 49D.

> **49E:  In consultation with Cliff Davis, DHW will identify current
> system capacity, service gaps and targets for explaining core
> services in each region**.

DHW staff consulted with Mr. Davis in 2002 to identify methods of

determining current system capacity, gaps and targets.  (Tr., p. 1585-86).

DHW has identified a baseline using service utilization data from FY 2001

to measure progress over time for each of the core services by region and

statewide.  (Tr., p. 1945-46).  Exhibits 1108 and 2362 are charts created by

DHW providing data on the provision of each core service, including the

number of children served, the source of the funding, and the amount of

funding, both by region and statewide.  DHW regions each have developed

service delivery goals, or targets, for the core services that they have

identified for efforts in increasing capacity.  (Tr., pp. 1951-52).  Exhibit

2077 is a copy of the regional service delivery goals.  (Tr., p. 1951).  The

Court finds that DHW substantially complied with Action Item 49E.

**49F:  It is hoped that if DHW gets the SAMHSA grant that it can be used to develop a method for tracking staff time and developing a staff baseline**.

DHW was awarded a SAMHSA grant, but was not able to utilize the grant to develop a method for tracking staff time.  (Tr., p. 1586).  It was determined that it would be more cost efficient and effective to identify a method for tracking staff time for both the CMH and Child Welfare programs, rather than only the CMH program, given the significant cost of conducting such a study and developing recommendations.  (Tr., p. 1586-87).  DHW has been able to identify funding to contract for a time study for both programs and currently have a contract working on this issue.  (Tr., p. 1587).  The Court finds that DHW substantially complied with Action Item 49F.

**49G:  DHW is in the process of establishing a continuous quality assurance process to monitor the system and provide continuous opportunities to improve the system as it develops.  This plan is to be established by January 1, 2003**.

DHW developed a Continuous Quality Improvement (CQI) plan that provides instruction on how the CMH program is to use and gather information to continuously improve the program and services.  (Tr., p.

**Findings of Fact and Conclusions of Law - 127**

1888).  Exhibit 2236 is the CQI plan. (Tr., p. 1888).  DHW implemented the

plan in June of 2003.  (Tr., p. 1888).

The CQI plan has three primary components, the first being its

purpose, which is to utilize different information sources to monitor and

increase the quality of the program.  (Tr., p. 1888-89).  The CQI plan

includes a case review model that is intended to look at actual case files and

compare them to the best practice standards that have been implemented.

(Tr., p. 1889).  DHW has created detailed instructions on the use of the case

review model, providing a description of the different components, defining

the objectives, and providing instructions on how the instrument is to be

used.  (Tr., p. 1890).  Exhibit 2396 is a copy of the instructions for use of the

case review instrument.  (Tr., p. 1889-90).  Exhibit 2397 is the CQI case

review instrument.  (Tr., p. 1890-91).

DHW has provided statewide training to staff on the CQI plan, the

case review instrument and has used the instrument to review cases.  (Tr., p.

1891).  The Court finds that DHW substantially complied with Action Item

49G.

**49H:  It is anticipated that the continuous quality improvement
plan will be implemented within six months of its
establishment (January 1, 2003).**

As noted above, DHW developed a Continuous Quality Improvement (CQI) plan that provides instruction on how the CMH program is to use and gather information to continuously improve the program and services.  (Tr., p. 1888).  Exhibit 2236 is the CQI plan.  (Tr., p. 1888).  The plan, described in the preceding paragraph, was implemented in June of 2003.  (Tr., p. 1888).  The Court finds that DHW substantially complied with Action Item 49H.

> **49I:   A policies and procedures manual is being developed by DHW for all children's MH employees that will have essential information, policies, protocols and procedures in one place**.

DHW contracted for the development of this manual in cooperation with the Child Welfare program, but the product provided by the contractor was not acceptable.  (Tr., p. 1587-88).  DHW will continue to work on this task and has determined to assign it to a CMH program staff member to complete.  (Tr., p. 1588).  However, the Court finds that DHW has not substantially complied with Action Item 49I.

> **50A:  See actions under 12 – development of a more integrated information management system across agencies**.

This is simply a statement referencing another recommendation. It does not require any specific action by DHW to comply with this particular

Action Item.

**50B:  See actions under 14 – development of a more integrated information management system across DHW's internal programs**.

This is simply a statement referencing another recommendation. It does not require any specific action by DHW to comply with this particular Action Item.

**50C:  See actions under 49 – improved tracking of funding resources and outcomes**.

This is simply a statement referencing another recommendation. It does not require any specific action by DHW to comply with this particular Action Item.

**50D:  DHW has developed a common client directory that may help with the integrated management of client services across multiple programs and service systems within the Department**.

DHW has developed a common client directory that allows staff to be able to see what programs a client may be involved in across service systems internally.  (Tr., p. 1592).  The current system identifies clients service in other programs, which can allow more comprehensive planning and coordination of services.  (Tr., p. 1592).  The Court finds that DHW substantially complied with Action Item 50 D.

**Findings of Fact and Conclusions of Law - 130**

B.      **DJC and Recommendation 23**

DJC Director Reinke testified that Recommendation 23 called for

ICCMH to make an initial recommendation for additional funds in

subsequent years, and not for the transfer of money in fiscal years 2000 and

2001.  (Tr., pp. 1431-35).  The transfer was contingent upon a reduction in

DJC's SED population, which did not occur.  (Tr., p. 1433).  Plaintiffs have

not presented evidence challenging DJC's interpretation of Recommendation

23.  Accordingly, the Court will not hold DJC in contempt for not

transferring money pursuant to Recommendation 23.

## CONCLUSIONS OF LAW

As noted above, for a plaintiff to succeed on a motion for civil

contempt, it must "show by clear and convincing evidence that [the

defendant] violated the consent judgment beyond substantial compliance,

and that the violation was not based on good faith and reasonable

interpretation of the judgment."  *Wolfard Glassblowing Co. v. Vanbragt*, 118

F.3d 1320, 1322 (9th Cir. 1997).  The Court concludes that Plaintiffs have

met this burden with respect to the following Action Items: 1K, 3B, 3D, 4G,

11F, 25D, 25E, 26C, 27B, 29J, 30B, 30C, 30D, 31E, 31I, 32C, 36B, 39B,

40E, 41C and 49I.  The Court concludes that Plaintiffs have not met this

burden with respect to any other Action Items.  Additionally, Plaintiffs have

not met their burden with respect to DJC on any of the Action Items.

## REMEDY

The Court orders DHW to take all steps necessary to substantially

comply with Action Items 1K, 3B, 3D, 4G, 11F, 25D, 25E, 26C, 27B, 29J,

30B, 30C, 30D, 31E, 31I, 32C, 36B, 39B, 40E, 41C and 49I within 120 days

of the date of this Order.  Once the defendants are in compliance with these

Action Items, the defendants may file a motion to vacate the consent decrees

pursuant to Federal Rule of Civil Procedure 60(b).

DATED:  February 7, 2007

B. LYNN WINMILL
Chief Judge
United States District Court

Findings of Fact and Conclusions of Law - 132